2007-NMCA-065

159 P.3d 1117

**NEW MEXICO BANQUEST INVESTORS CORPORATION, Petitioner/Counterdefendant–Appellee/Cross–Appellant,**

v.

**The PETERS CORP., Milo L. McGonagle, Jr., and E.W. Sargent, Respondents/Counterclaimants/Third–Party Plaintiffs–Appellants/Cross–Appellees,**

v.

**Edward B. Bennett, Third–Party Defendant–Appellee.**

**No. 25,276.**

Court of Appeals of New Mexico.

March 6, 2007.

Certiorari Granted, No. 30,292, May 24, 2007.

**634**

Tucker Law Firm, P.C., Steven L. Tucker, Santa Fe, NM, Comeau, Maldegen, Templeman & Indall, LLP, Michael B. Comeau, Santa Fe, NM, for Petitioner/Counterdefendant–Appellee/Cross–Appellant.

Freedman, Boyd, Daniels, Hollander & Goldberg, P.A., Joseph Goldberg, John W. Boyd, Dana K. Grubesic, Albuquerque, NM, C. Mott Wooley, Santa Fe, NM, for Respondents/Counterclaimants/Third–Party Plaintiffs–Appellants/Cross–Appellees.

Brennan & Sullivan, P.A., Michael W. Brennan, Santa Fe, NM, for Third–Party Defendant–Appellee.

## OPINION

ALARID, Judge.

{1} This case requires us to examine dissenting shareholders' rights to obtain the fair value of their shares under NMSA 1978, Section 53–15–4 (1983), and under a particular shareholder agreement among the parties. Specifically, we decide whether, under the circumstances of this case: (1) a control premium is payable on the dissenting shareholders' shares; (2) punitive damages should be awarded; (3) the district court erred in determining the shareholders' agreement to be clear and unambiguous; and (4) the judgment amount representing the fair value of the dissenting shareholders' shares may bear interest compounded annually. We affirm the district court's order on all issues relating to the appeal and the cross-appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

{2} First National Bank of Santa Fe (the Bank) is a federally chartered bank with its principal place of business in Santa Fe, New Mexico. In 1979, Edward Bennett, Third–Party Defendant in this case (Bennett), purchased a 46% interest in New Mexico Bancorporation, the bank holding company that holds 100% of the shares of the Bank. In 1980, New Mexico Bancorporation changed its name to New Mexico Banquest Corporation (Banquest). In 1982, a small number of investors, including Respondents/Third–Party Plaintiffs, The Peters Corporation, Milo L. McGonagle, Jr., and E.W. Sargent (collectively the Peters Group), purchased a minority interest in Banquest. In 1982 and early 1983, a large Spanish bank, Banco Bilbao de Vizcaya (BBV), as successor to Banco de Vizcaya, agreed to invest $10 million in the Bank enterprise. To facilitate the BBV investment, a second tier holding company was formed, Petitioners New Mexico Banquest Investors Corporation (NMBIC). In addi-

tion to facilitating the BBV investment, NMBIC was formed to assume the personal debts incurred by the Banquest shareholders when they purchased Banquest shares. NMBIC assumed and paid $327,832 of stock acquisition debt of the Peters Corporation; $86,180 incurred by McGonagle; and $69,500 incurred by Sargent.

{3} NMBIC is a close corporation. As of June 30, 1996, there were 502,589 NMBIC shares outstanding with a total of 68 shareholders in twelve states and two foreign countries. Regarding the stock interests of the NMBIC shareholders relevant to this dispute, BBV owned 198,913 shares or a 39.6% interest; the Peters Corporation owned 19,526 shares or a 3.88% interest; Milo McGonagle owned 2,506 shares or a 0.5% interest; E.W. Sargent owned 2,000 shares or a 0.4% interest; Bennett owned 88,897 shares or a 17.7% interest; and Bennett's family members owned 22,026 shares or a 4.4% interest in NMBIC at the time. Bennett was president of NMBIC, chairman of the board of directors, and controlling shareholder in NMBIC. He was also president of the Bank and chairman of the board of directors of the Bank. The Peters Group were minority shareholders in NMBIC, and at the time they exercised their dissenters' rights in August 1996, they had been NMBIC shareholders for about thirteen years.

{4} In 1983, Bennett and certain other shareholders, including the Peters Group, executed a shareholders' agreement (the Shareholder Agreement). This agreement contained the following provisions, among others: (1) management and control of NMBIC and Banquest was placed in Bennett and a board selected by Bennett, subject to overrule by a supermajority of shareholders; and (2) requirement that, if any signatory shareholder chose to sell his or her shares, the other shareholders would each have the right to buy his or her pro-rata share of the selling shareholder's stock. In 1983, when BBV acquired its stock in NMBIC, it also entered into a shareholders' agreement with certain NMBIC shareholders including Bennett and the Peters Group (the BBV Agreement). The BBV Agreement expired after ten years and was reissued in 1993, with the same language in the provisions relevant to this dispute. The rights of the NMBIC shareholders, in the event that BBV should desire to sell its shares in NMBIC, is the basis of the Peters Group's counterclaims against NMBIC and its third-party complaint against Bennett.

{5} In 1995, BBV determined that it must sell its interest in NMBIC, initially, because of banking regulations regarding limits on foreign bank holdings in the United States. Although the banking regulations changed, BBV decided to sell all of its NMBIC shares and contacted Bennett. Under the BBV Agreement, Bennett was appointed by the other shareholders to receive notice from BBV of BBV's intent to sell its shares. Bennett consulted legal counsel and based on counsel's advice, Bennett determined that he and his family would not purchase the BBV shares and also would not assign their options to purchase. The district court found that Bennett's motivation in structuring the redemption of the BBV shares was: (1) the establishment of an employee stock option plan; (2) the tax benefits of a redemption over purchase by individuals; (3) the financial efficiency of a redemption; (4) the elimination of the possibility that the shares would fall into the hands of an unfriendly third party; (5) the broadening of the shareholder base; and (6) to provide stability and continuity of management.

{6} The district court found that the BBV Agreement clearly and unambiguously provided that any NMBIC shareholder, by declining to exercise the shareholder's option to purchase a pro rata portion of the BBV shares and by declining to assign the shareholder's option to purchase the pro rata portion to another shareholder, could prevent any other shareholder from purchasing any BBV shares and allow BBV to sell its shares to a third party. NMBIC was granted summary judgment against the Peters Corporation on this issue and in issuing its findings and conclusions, the district court specifically agreed that these provisions of the BBV Agreement reflected the intent of the parties. Several other NMBIC Board members also determined that they would not individually

purchase or assign their rights to purchase their pro rata portion of the BBV shares, leaving the door open for an NMBIC redemption of the shares as a third party.

{7} On May 9, 1996, BBV and NMBIC entered into a letter of intent whereby NMBIC would redeem all of the BBV shares in NMBIC. Although Bennett had discussed the sale with counsel, the Board of Directors, and some NMBIC shareholders, Bennett initially did not disclose anything to the Peters Group. The Peters Group was first notified in proxy materials noticing a special shareholders' meeting sent to the NMBIC shareholders on July 10, 1996. The NMBIC shareholders' meeting was held on July 23, 1996. All NMBIC shareholders, except the Peters Group and one other shareholder holding a 1.2% interest in NMBIC, declined to exercise their individual rights of first refusal or to assign such rights, preferring to ratify NMBIC's redemption of the BBV shares. The Peters Group dissented from the redemption, decided not to remain NMBIC shareholders, and immediately sought to obtain fair value of their NMBIC shares under Section 53–15–4.

{8} After the shareholders' meeting ratifying the redemption, NMBIC purchased BBV's interest in NMBIC for twice book value as of December 31, 1995, or $82.13 per share, for a total of $16,336,000. NMBIC financed the purchase by reissuing the BBV stock at $56.00 per share, issuing preferred stock, and borrowing money. NMBIC also established an employee stock ownership plan (ESOP) that would purchase 80,000 shares of the new offering at a total price of $4,480,000 and would borrow funds for the purchase. NMBIC then guaranteed the ESOP's debt.

{9} When NMBIC and the Peters Group could not agree on the fair value for the Peters Group's shares, NMBIC petitioned the district court, under Section 53–15–4, to determine their fair value. The Peters Group answered the Petition and filed counterclaims against NMBIC, along with a third-party complaint against Bennett, asserting fraud, breach of fiduciary duty, breach of contract, and asking for rescission and punitive damages. In 2002, the district court granted NMBIC's motion for summary judgment in part, determining that the applicable section of the BBV Agreement was not ambiguous, thus dismissing the Peters Group's claim for breach of contract. The parties proceeded to trial on the other counterclaims and third-party claims.

{10} After trial, the parties entered proposed findings and conclusions. The district court entered findings and conclusions, awarding the Peters Group its statutory appraisal remedy at $99.52 per share, without minority discount or control premium, and including interest at 10% compounded annually, plus witnesses and attorney fees. The district court found that Bennett had breached his fiduciary duty to the Peters Group by failing to notify them that BBV intended to sell its shares prior to sending out proxy materials on July 10, 1996, while he did inform some other NMBIC shareholders and the NMBIC Board of Directors. The district court, however, found no fraud or self dealing by Bennett or NMBIC. Rather the district court determined that the redemption structure was motivated by the business and financial interests of NMBIC rather than the entrenchment of Bennett. The district court also determined that the Peters Group could not detrimentally rely on the lack of notice and that the breach did not cause damages to the Peters Group or grant a windfall to NMBIC or Bennett. Having awarded the appraisal remedy, the district court denied any further award of damages or punitive damages on the counterclaims and the third-party complaint. The Peters Group appealed the district court's decision not to add a control premium to the fair share value, granting summary judgment on its breach of contract claim under the BBV Agreement, and denying punitive damages for breach of fiduciary duty. NMBIC counter-appealed contending that the district court erred in awarding interest compounded annually rather than simple interest.

## I. Control Premium

{11} The parties agreed that the Peters Group were entitled to receive the fair value of their NMBIC shares, but disagreed as to what the value should be. After hearing

expert opinions presented by both sides, the district court determined that the fair value of the Peters Group's NMBIC shares as of the date of the shareholder vote ratifying redemption of the BBV shares on July 23, 1996, was $99.52. This finding was largely in accordance with the Peters Group's expert's opinion. The district court relied generally on the expert's testimony, because of his "extensive experience and education in valuing stock for purposes of dissenter's rights cases," because the district court recognized that his opinions "were based on accepted assumptions and methods for such valuations." In arriving at the fair value of the Peters Group's stock, the expert, Robert F. Reilly, used three business valuation methodologies: (1) the Guideline Publicly Traded Company Method; (2) the Guideline Merged or Acquired Company Method, both of which used the market approach to business valuation; and (3) the Discounted Cash Flow Method, which used the income approach. Although business valuation approaches also generally use an asset-based approach, ultimately Mr. Reilly did not use the asset accumulation method in this case, because of the lack of data available to him for the discrete appraisal of all of NMBIC's tangible and intangible assets. Using the three approaches, Mr. Reilly arrived at three separate total equitable business values for NMBIC. He assigned weights to them—60% on a 50/50 basis to the two market approach total values and 40% to the income approach total value, arriving at one total equitable value, and then divided this total equitable value by the total number of outstanding shares and multiplied the per share value by the number of shares held by each member of the Peters Group.

{12} The district court stated in its finding of fact number 25: "The determination of the fair value of the stock is based on the shareholders' proportionate ownership interest in the corporation without any minority discount or marketability discount." Neither party appeals the district court's reliance on Mr. Reilly's usage or application of the market and income methodologies, the companies selected for comparison under the market analyses, or the weights assigned in reaching a per share value of $99.52. On appeal, however, the Peters Group contends that the district court erred in refusing to add a 40% increase to the total business value of NMBIC arrived at under the Guideline Publicly Traded Company Method, asserting that they are entitled to a price premium for ownership control. The district court declined to add the control premium increase stating, "[s]uch a premium is not consistent with the total value of a publicly traded corporation[,]" and "[the expert] failed to present credible evidence as to the basis for such a price premium." We agree.

{13} The Peters Group argues for a de novo standard of review on the control premium issue, contending that the issue "is whether, as a matter of law, in determining the 'fair value' of shares under [Section] 53–15–4(E), a control premium should be added when a publicly traded [companies business valuation] approach is used." They cite to other jurisdictions that, they contend, recognize "that when a publicly traded companies [method] is used in determining fair value, ... there is an inherent minority trading discount" because "the [valuation] method depends on comparisons to market multiples derived from trading information for minority blocks of comparable companies." They argue, therefore, that in reaching a fair value, an expert or district court must, as a matter of law, correct for the minority trading discount by adding back a control premium. In addition, the Peters Group asserts that the district court's findings and conclusions indicate a rejection of minority discounts as a matter of law. As such, they contend, the district court's refusal to adjust upwards the total value of NMBIC arrived at using the publicly traded companies approach, i.e., to add an ownership control premium, fails to compensate the dissenters for the inherent minority discount built into the publicly traded companies methodology. This failure to allow the upward adjustment, according to the Peters Group, mistakenly allows a minority discount to remain in effect, and is, therefore, inconsistent with the district court's explicit rejection, as a matter of law, of minority discounts. We are not persuaded.

{14} Under NMSA 1978, Section 53–15–3(A)(1) (1983), "dissenting shareholders who object to a merger [or other consolidation action of which the corporation is a party] have a statutory right to be paid the fair value of their stock upon demand." *Smith v. First Alamogordo Bancorp., Inc.*, 114 N.M. 340, 341, 838 P.2d 494, 495 (Ct.App.1992). "The court may, if it so elects, appoint one or more persons as appraisers to receive evidence, and recommend a decision on the question of fair value." *Id.* at 341–42, 838 P.2d at 495–96 (internal quotation marks omitted). The appraiser's valuation is subject to review by the district court to determine whether it is supported upon reasonable grounds, and if it is not, the district court may substitute its own calculation and modify the weights to be given each valuation factor. *Id.* at 345, 838 P.2d at 499.

▪ {15} In *Tome Land & Improvement Co. v. Silva,* 83 N.M. 549, 494 P.2d 962 (1972), our Supreme Court noted that Section 53–15–4 (discussing rights of dissenting shareholders to obtain payment for the fair value of the shareholder's shares) does not specify the method by which a court should determine fair value of shares. In arriving at fair value, however, "courts have been almost unanimous in using a combination of three [methods] of valuation: (1)[n]et asset value; (2) market value; and (3) investment or earnings value." *Tome,* 83 N.M. at 552, 494 P.2d at 965. In New Mexico, appraisers and/or district courts have broad discretion in this area, and they may weigh the valuation factors in "whatever proportion the court believes is appropriate to reflect their importance and reliability in a particular case." *McCauley v. Tom McCauley & Son, Inc.,* 104 N.M. 523, 532, 724 P.2d 232, 241 (Ct.App.1986) (discussing that in *Tome,* our Supreme Court held that, with regard to the dissenting shareholder's appraisal remedy, it is well settled in New Mexico "that the appellate court will not substitute its judgment for that of the district court in weighing the evidence. If the [district] court's findings are supported by substantial evidence," they must be affirmed). *See also Smith,* 114 N.M. at 344, 838 P.2d at 498 (discussing that the appraiser, or the district court, as applicable, "has discretion in determining market, asset

and investment value" of the shares) (internal quotation marks and citation omitted). Thus, in this case, we evaluate whether the district court erred in refusing to add a control premium to the value of the Peters Group's shares in NMBIC under the substantial evidence standard of review.

▪ {16} A control premium is "[a] premium paid for shares carrying the power to control a corporation." *Black's Law Dictionary* 1219 (8th ed.2004). A control premium typically refers to the additional amount a buyer would pay for a block of shares that would give the buyer control of a corporation. *See generally Eateries, Inc. v. J.R. Simplot Co.,* 346 F.3d 1225, 1232 (10th Cir.2003); *Foltz v. U.S. News & World Report, Inc.,* 865 F.2d 364, 371 (1989); *Oberly v. Kirby,* 592 A.2d 445, 470 (Del.1991). More broadly considered, the determination of an appropriate control premium adjustment

> entail[s] considering any number of factors including, whether the sale ends a long-standing controversy over control of the company, whether the sale involves a substantial percentage of the corporation's stock, whether the sale would give the buyers the certainty of ongoing control, and whether the buyers could afford to pay a substantial premium.

*Koch v. Koch Indus., Inc.,* 6 F.Supp.2d 1192, 1205 (D.Kan.1998); *see also,* John C. Coates IV, *"Fair Value" as an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions,* 147 U. Pa. L.Rev. 1251, 1260–61 (1999) (stating " 'Fair value' is determined by a court, and is not defined in statutes … methodological choices are made by the fact-finder on a case-by-case basis."). Therefore, depending on the facts of a particular case, minority discounts or control premiums may or may not be a relevant factor in the fair value analysis. *See Estate of Godley v. Comm'r of Internal Revenue,* 286 F.3d 210, 214–15 (4th Cir.2002); *Joe Esco South–West Tire Co. v. United States,* 582 F.Supp. 993, 1001 (W.D.Okla.1983).

{17} The Coates article on fair value analysis discusses that control premiums and minority discounts, defined as the difference between the value of control shares and the

value of minority shares of a public company, respectively, are the inverse of one another, and that subtracting value to reflect a minority discount or adding value to reflect a control premium may distort the fair value of shares in conflict transactions. Coates, *supra*, at 1278. For example, the presence of a minority discount may be unfair to the dissenting minority shareholder sellers by allowing the buyers a lower price when the purchased shares are really worth more because their purchase may further consolidate a control situation. Coates, *supra*, at 1295. On the other hand, the addition of a control premium, for reasons other than that the sale is of an actual control block of shares, may unreasonably burden the buyers or the buying corporation and may call into question the responsibility of the directors to the corporation's other shareholders in buying the shares for more than they are worth. Coates, *supra; see also Foglesong v. Thurston Nat'l Life Ins. Co.*, 555 P.2d 606, 611 (Okla.1976) (discussing that shareholders' expectations as investors rather than participants in control should govern whether a control premium is payable. "Such that [t]he purchase of stock to gain controlling interests is not properly includible in determining the [fair] value of the shares of stock" for the purchase of investment shareholders' shares, because investment shareholders purchased their shares for investment purposes only, and thus they only "expect their investment to be protected and not to participate in control").

{18} While courts have dealt in a variety of ways with the allegations that a minority discount is built into the guideline publicly traded market methodology, there is by no means any consensus on the issue. *See, e.g.,* Coates, *supra*, at 1287 ("So where does Delaware law stand today on discounts and premiums? The case law is, to be blunt, a mess."); *see also* Richard A. Booth, *"Minority Discounts and Control Premiums in Appraisal Proceedings,"* 57 Bus. Law. 127, 128 (2001) ("It is the thesis here that the addition of a control premium is inconsistent with settled corporation law and good policy that there is no basis for the assumption that market prices routinely build in a minority discount. In other words, the courts have gone too far in an effort to guard against minority discounts and have infringed on the legitimate rights of majority stockholders to enjoy the recognized perquisites of control."). Essentially, and we think the experts in this case would agree, valuation is science and art. Thus, while some courts have determined that adding a control premium or subtracting for a minority discount reflects a forbidden "second-stage" adjustment to fair value and prohibit these adjustments, Coates, *supra*, at 1349, other courts, including New Mexico courts, have deferred to the fact finder in upholding or denying adjustments to fair value for control premium or minority discount. *See, e.g., McCauley*, 104 N.M. at 534–35, 724 P.2d at 243–44 (allowing a 25% minority discount since the fair value determination vested in the trier of fact); *see also McDaniel v. Painter*, 418 F.2d 545, 548 (10th Cir.1969) (discussing that, while "it is generally recognized that majority stock is more valuable than minority stock," the amount of a control premium is a question of fact determined on a case-by-case basis). We believe that New Mexico's case law should continue to support a case-by-case assessment.

{19} In this case, the district court gave the dissenters their proportionate ownership interest in NMBIC, endorsing a fair value without a minority or marketability discount and excluding a control premium. *See* Booth, *supra*, at 140 (discussing that "the goal of appraisal," as recognized in the seminal case in this area, *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del.1989), "is to determine the per share value of the entire corporation and not the value of specific shares—presumably whether they are minority shares or control shares"). Although NMBIC and its expert argued below for a minority discount, they do not appeal the district court's decision not to grant one on appeal. Thus, the Peters Group succeeded in obtaining fair value without minority or marketability discount, but they also want a control premium, the purpose of which, as discussed above, is to recognize the sale of a controlling interest, the consolidation of control, and/or offset for an alleged minority discount built into the publicly traded companies business valuation methodology.

{20} As the district court recognized, however, sale of control was not at stake here. The Peters Group were minority shareholders in NMBIC. The district court determined the fair value of the Peters Group's shares on an equal basis with all shareholders, i.e., not subtracting for a minority discount nor adding any control premium. In this case, this result is substantially supported by the facts. That is, NMBIC did not prove that a minority discount should be payable, particularly in light of the following facts of this case: that the Peters Group were signatories to the shareholder agreement and the BBV Agreement, which allowed them, as minority shareholders, to be members of the control group of NMBIC shareholders in terms of supporting Bennett and the Board of Directors of NMBIC and operating the Bank. The Peters Group were in this position for over thirteen years. In addition, NMBIC's purchase of the Peters Group's shares benefitted NMBIC by serving to further consolidate control without the Peters Group, thereby freezing out a minority group of shareholders, who were possibly "unfriendly" because they were engaged since 1989 in a control position in Century Bank, a bank that directly competes with the Bank for market share in the same locale. These facts substantially support the district court's decision to not impose a minority or marketability discount on the fair value of the Peters Group's NMBIC shares.

{21} On the other hand, with regard to the district court's decision not to add a control premium, as the district court recognized, the Peters Group's expert did not prove that such a premium would be appropriate in this case. Although the Peters Group were part of the control group as signatories to the Shareholder Agreement and the BBV Agreement, they were minority shareholders within that group and within NMBIC as a whole. Under the Shareholder Agreement without BBV, they had delegated all decisions to Bennett who was entitled to determine the Board of Directors and to operate the Bank. In purchasing a minority interest in NMBIC, therefore, the Peters Group had no real expectation or ability, on their own, to control the NMBIC Board of Directors or other shareholders. Moreover, under the BBV

Agreement, as will be discussed below, each of the individual shareholders essentially had veto power over whether all the shareholder signatories as individuals could purchase their pro rata portion of any BBV shares before the shares could be offered to a third party. Significantly, as the district court found, the rationale for redemption by NMBIC of the BBV shares over individual purchase was based on the advice of counsel and several business and financial factors desirable to NMBIC and the Bank, rather than primarily to "entrench" Bennett. Finally, given that the district court arrived at a fair value that does not impose a minority or marketability discount under the circumstances of this case, no control premium would be warranted to offset any theoretically alleged built-in discount. These facts substantially support the district court's decision not to add a control premium. We agree with the district court that the Peters Group's expert "failed to present credible evidence as to the basis for such a price premium."

{22} Thus, we affirm the district court on this issue. We hold that the evidence supports the court's findings and the findings support the court's decision not to add a control premium to the fair value of the Peters Group's shares under the circumstances of this case.

## II. Breach of Fiduciary Duty and Punitive Damages

{23} The Peters Group contends that the district court erred in refusing to award punitive damages to them for Bennett's breach of fiduciary duty. They point out that Bennett was the chief executive officer of NMBIC when he committed the breaches and that he held animosity toward Gerald Peters as a threat to NMBIC in a situation where the law recognizes a heightened duty of candor and good faith: when majority shareholders are dealing with minority shareholders. The Peters Group also asserts that Bennett's breach of fiduciary duty diverted the opportunity from the Peters Group to rally the shareholders to purchase individually or as a third-party-purchaser to purchase all of the BBV shares. The Peters

Group contends that because of the heightened concern against breach of fiduciary duty in the majority/minority shareholder situation, courts do not require the victim to prove damages, only that there was a breach. As such, the Peters Group asserts that the district court erred by placing the burden on them to show harm from the breach of fiduciary duty when the burden should have been placed on NMBIC and Bennett to show no injury or harm to the Peters Group. Thus, the Peters Group contends, any uncertainty or speculation about whether the Peters Group could, financially, have purchased all of BBV's shares should not have been placed on the Peters Group. They argue that NMBIC and Bennett, the fiduciary, "played spoiler" of the shareholders' individual pro rata options under the BBV Agreement, forfeiting the Peters Group's rights to exercise their pro rata options, in addition to giving NMBIC and Bennett an unfair advantage and an unfair amount of time to arrange for NMBIC to buy all of BBV's shares as a third party rather than the Peters Group having that opportunity.

{24} The Peters Group claim, moreover, that NMBIC and Bennett did receive significant benefits from secretly negotiating with BBV. That is, NMBIC was able to purchase the BBV shares for $82.13 per share when the district court determined, in this litigation, that as of June 30, 1996, the shares were worth $99.52 per share, resulting in a benefit to NMBIC of $3,459,097.07. In addition, they point out that Bennett received a $50,000 bonus as a result of the BBV redemption, and that he and other NMBIC and new shareholders were able to personally purchase shares at $56.00 per share in the reissue of NMBIC shares in connection with NMBIC's financing of the redemption of the BBV shares.

{25} The Peters Group contends, therefore, that since as determined in this litigation, the shares were worth $99.52, Bennett derived a benefit of $233,136.64. The district court erred, they contend, in refusing to provide any remedy that would: deter breaches of fiduciary duty of this kind; punish Bennett for his egregious conduct; disgorge from NMBIC and Bennett the benefits they re-

ceived; and compensate the Peters Group for their injuries. We affirm the district court on this issue.

{26} Recently, this Court held that Section 53–15–4 provides the exclusive remedy for dissenting shareholders against a corporation. *McMinn v. MBF Operating, Inc.,* 2006–NMCA–049, ¶¶ 16, 139 N.M. 419, 133 P.3d 875, *cert. granted,* 2006–NMCERT–004, 139 N.M. 429, 134 P.3d 120. However, there is an exception to this rule "when the corporate action is unlawful or fraudulent with regard to the complaining shareholder or to the corporation." *See* Section 53–15–3(D). "[T]he issue of whether all of the claims asserted fall within the exclusivity of the appraisal remedy requires an application of law to the facts, which is subject to de novo review." *McMinn,* 2006–NMCA–049, ¶ 13, 139 N.M. 419, 133 P.3d 875. The complaining shareholder has the burden of proving that fraudulent or illegal activity occurred. *Id.* ¶¶ 30, 33–34. "[C]laims that the majority instituted the merger only to freeze out the minority do not state a claim for fraud or illegal conduct that is recognized outside of the appraisal remedy." *Id.* ¶ 32. In discussing what types of conduct might fall within the statutory exception for fraud or unlawful conduct, this Court cited to the discussion on the issue in *Weinberger v. UOP, Inc.,* 457 A.2d 701, 714 (Del.1983), as helpful in defining the types of claims that are not adequately remedied by the statutory appraisal proceeding. *McMinn,* 2006–NMCA–049, ¶ 22, 139 N.M. 419, 133 P.3d 875. The appraisal remedy we approve may not be adequate in certain cases, particularly where "fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching" are involved. *Id.* (internal quotation marks and citation omitted).

{27} In this case, we hold that the Peters Group failed to show any fraud or illegal activity that (a) takes this case outside the exclusivity of the appraisal remedy, and (b) that would justify an award of damages or punitive damages. Having awarded the appraisal remedy, including a fair value of $99.52 that includes no minority discount, interest at 10% compounded annually, and witness and attorney's fees, the district court

denied any further award of damages or punitive damages on the counterclaims and the third-party complaint. We agree with this result and believe that it comports with this Court's opinion in *McMinn* and other New Mexico law.

{28} Punitive damages are awarded for the limited purposes of punishment and to deter others from the commission of like offenses, *see Madrid v. Marquez*, 2001–NMCA–087, ¶ 4, 131 N.M. 132, 33 P.3d 683; *Sanchez v. Clayton*, 117 N.M. 761, 766, 877 P.2d 567, 572 (1994). Punitive damages are only appropriate to punish conduct that is "[o]verreaching, malicious, or wanton conduct ... is inconsistent with legitimate business interests, [that] violates community standards of decency, and tends to undermine the stability of expectations essential to contractual relationships." *Romero v. Mervyn's*, 109 N.M. 249, 258, 784 P.2d 992, 1001 (1989). " '[M]alice ... means the intentional doing of a wrongful act without just cause or excuse.' " *Id.* at 255, 784 P.2d at 998 (internal quotation marks and citation omitted); *see also Gonzales v. Surgidev Corp.*, 120 N.M. 133, 145, 899 P.2d 576, 588 (1995) ("To be liable for punitive damages, a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level.") (Internal quotation marks and citation omitted). "In the context of a punitive damages claim, reckless is defined as the intentional doing of an act with utter indifference to the consequences." *Id.* (internal quotation marks and citation omitted). *See also* UJI 13–1827 NMRA (reading that, "[i]f you find that the conduct of (name of party against whom direct liability for punitive damages is asserted) was [malicious], [willful], [reckless], [wanton], [fraudulent] [or] [in bad faith], then you may award punitive damages against [him] [her] [it].").

{29} Whether conduct arises to the level such that punitive damages are appropriate is a mixed issue of fact and law. *McMinn*, 2006–NMCA–049, ¶ 13, 139 N.M. 419, 133 P.3d 875. To be actionable for damages, harm must also result from the breach. *See* UJI 13–1827 ("You may consider punitive damages only if you find that (party making claim) should recover compensatory [or nominal] damages."); *see also Turpin v. Smedinghoff*, 117 N.M. 598, 601, 874 P.2d 1262, 1265 (1994) (awarding attorney fees in breach of fiduciary duty case requires showing of harm caused by the breach). In *Jacobs v. Phillippi*, 102 N.M. 449, 451, 697 P.2d 132, 134 (1985), for example, the plaintiffs contended that the trial court erred in concluding no damage was caused by the defendant's breach of fiduciary duty. The Supreme Court disagreed, stating that, "[t]he standard for review on appeal is whether substantial evidence supports the findings of the trial court," *Id.* Thus, although the trial court determined that the defendant had breached his duty, substantial evidence existed to support the trial court's findings that the difference in interest rates was not a material factor in the negotiations between the parties and in the execution of the real estate contract. The trial court held, therefore, that the plaintiffs could not recover damages for the higher interest rate absent proof that damage occurred. *See also Bank of N.M. v. Rice*, 78 N.M. 170, 177, 429 P.2d 368, 376 (1967).

{30} In this case, the crux of the Peters Group's argument on appeal is that they are entitled to punitive damages as deterrence and punishment, without proof of actual damages, as a matter of law. As such, the Peters Group does not argue that the district court's findings of fact are not supported by substantial evidence. As a matter of substantial evidence the record indicates, and the district court determined, that Bennett had breached his fiduciary duty to the Peters Group by failing to notify them that BBV intended to sell its shares prior to sending out proxy materials on July 10, 1996, while he did inform some other NMBIC shareholders and the NMBIC Board of Directors. Substantial evidence supports the district court's finding that, even if they had been timely informed of BBV's intention to sell its shares, the Peters Group were not "ready, willing and able to purchase all the BBV shares," which NMBIC purchased as a corporate redemption for $16,336,000. *See, e.g., Hilger v. Cotter*, 75 N.M. 699, 701, 410 P.2d 411, 413 (1966) (stating that, "[i]t is well established that a complainant in a suit [in equity] must

allege that he has performed his part of the contract or that he is ready, able and willing to perform it"). The Peters Group were not ready, willing, and able to purchase because, having reviewed the Peters Group's tax statements and other financial documents, an investment of $16 to $18 million dollars was not consistent with the Peters Corporation's financial situation at the time.

{31} Moreover, any attempts by the Peters Group, as the Peters Corporation or as a group of individuals, to purchase the BBV shares would have faced rigorous scrutiny by the Federal Reserve Board and the U.S. Department of Justice. That is, substantial evidence was presented that in 1996 the other activities of the Peters Corporation were "non-permissible" businesses for a bank holding company, the Peters Corporation capital structure would have weakened NMBIC's capital structure, and Peters' ownership of a competing bank in Santa Fe would raise antitrust concerns at the Federal Reserve and the U.S. Department of Justice. The district court found expert testimony to the contrary to be "not credible."

{32} Substantial evidence was also presented that BBV would not have sold its shares to the Peters Group because of these concerns, particularly in light of the timelines under the BBV Agreement and the delay in obtaining federal approval for the sale. Substantial evidence was also presented that purchase by Bennett of NMBIC reissued shares following redemption was not related to any failure to timely disclose the transaction. Under the circumstances, rallying the shareholders as individual purchasers was acknowledged to be impossible given the wording of the BBV Agreement which allowed only all of the shareholders to purchase all of the BBV offered shares (Issue 3), and buying as a third-party purchaser was financially and legally not feasible. The Peters Group could have decided to remain NMBIC shareholders and participate in, or benefit from the redemption as well as to purchase reissued shares of NMBIC in connection with the BBV redemption, but they chose not to, opting to dissent for which the fair value, plus interest, and witness and attorneys fees, is their remedy.

{33} These findings support the district court's legal conclusions that, in this case and under these facts, although a breach of fiduciary duty occurred, it occurred in the kind of "freeze-out" transaction that the statutory appraisal remedy was designed for as the exclusive remedy. *McMinn,* 2006–NMCA–049, ¶¶ 21, 32, 139 N.M. 419, 133 P.3d 875. Thus, we hold that this case does not present the type of conduct by NMBIC and Bennett that falls outside the exclusivity of the appraisal remedy, for fraud or illegality, i.e., this is not conduct that rises to the level of fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching. *Id.* ¶ 22. "We agree that breach of fiduciary duty may sometimes rise to the level of fraud or illegality, but we decline to extend the statutory exception to all claims of breach of fiduciary duty. Other jurisdictions hold similarly." *Id.* ¶ 21.

{34} Our holding comports with the purpose behind the statutory appraisal remedy. In adopting it, our Legislature has determined the desirability of corporations having the ability to act by majority rather than unanimous vote, and the appraisal statutes, "have conferred upon the dissenting minority the right to force the corporation to buy out the minority interest in the corporation in order to avoid oppression of the dissenting minority shareholder and to compensate the minority for the loss of its traditional common law veto power." *Id.* ¶ 15. As such, the appraisal statute recognizes that conflict transactions are anticipated because a statutory remedy is provided, conflict transactions are unavoidable, and, in some instances, they may be beneficial to an ongoing business enterprise. The appraisal remedy provides the exclusive remedy for dissenting minority shareholders absent fraud or illegality, which are not present here.

{35} We affirm the district court's decision not to award punitive damages for the breach of fiduciary duty found in this case.

### III. Summary Judgment on the BBV Shareholder Agreement

{36} "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judg-

ment as a matter of law." *See Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. Where issues on appeal involve only questions of law, we review those questions de novo. *Id.* In this case, NMBIC moved for summary judgment on the basis, among others, that the applicable BBV Agreement contract provision is clear and unambiguous in allowing any one shareholder among the shareholders collectively to block the sale of the BBV shares to the shareholders as a group of individuals. The district court granted summary judgment on this issue only. The decision that the BBV Agreement was not ambiguous, foreclosed a trial involving extrinsic evidence of the parties's intent with regard to this provision. It is this decision that the Peters Group appeals. We affirm.

{37} Whether ambiguity in a contract exists is a question of law. *See Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999–NMSC–006, ¶ 28, 127 N.M. 1, 976 P.2d 1; *see also Nearburg v. Yates Petroleum Corp.*, 1997–NMCA–069, ¶ 7, 123 N.M. 526, 943 P.2d 560 ("Interpretation of an unambiguous contract is a question of law which we review de novo."). This Court reviews the district court's decision that a contract is not ambiguous de novo. *Id.* "[I]n a case where a pure question of law is at issue, we will not review a grant of summary judgment in the light most favorable to the party opposing the motion." *Rutherford v. Chaves County*, 2003–NMSC–010, ¶ 8, 133 N.M. 756, 69 P.3d 1199. " 'A contract must be construed as a harmonious whole, and every word or phrase must be given meaning and significance according to its importance in the context of the whole contract.' " *Aspen Landscaping, Inc. v. Longford Homes of N.M., Inc.*, 2004–NMCA–063, ¶ 14, 135 N.M. 607, 92 P.3d 53, (quoting *Bank of N.M. v. Sholer*, 102 N.M. 78, 79, 691 P.2d 465, 466 (1984)). *Peck v. Title USA Ins. Corp.*, 108 N.M. 30, 33, 766 P.2d 290, 293 (1988) (stating that absent ambiguity, construction of a contract is a matter of law).

{38} The applicable provision of the BBV Agreement reads as follows:

If BBV should desire to sell, in accordance with this Section, some or all of the BBV shares, BBV shall first send notice to the Shareholders stating the number of such BBV Shares that BBV desires to sell ("the Offered Shares") and the price and other terms of the proposed sales, and in that event the Shareholders shall have the option to purchase all (but not less than all) of such offered Shares within sixty days after the date of such notice at the price and other terms specified in such notice. Each Shareholder shall have the option to purchase that proportion of the number of Offered Shares identified in the notice which the number of shares of Stock owned by such Shareholder bear [sic] to the total number of shares of Stock owned by all Shareholders. Such options shall be freely transferable among Shareholders. If Shareholders do not purchase all of the Offered Shares, BBV may sell all such Offered Shares to a third party within ninety days after the date of such notice, provided that such sale takes place at exactly the same price, terms and other conditions as those specified in the notice to Shareholders.

{39} We agree with the district court that the contract is not ambiguous. The words, "the Shareholders shall have the option to purchase all (but not less than all)" and "[i]f Shareholders do not purchase all of the Offered Shares, BBV may sell all such Offered Shares to a third party," evince the express intent that the shareholders must act collectively to purchase all of the offered shares. The use of the words "[e]ach Shareholder" between the sentences that contain the previously quoted words, indicates that individual pro rata rights were contemplated should all the shareholders decide to buy all of the offered shares. That is, the absence of the words, "each Shareholder," in the surrounding sentences, clearly evinces the intent that each shareholder only has a pro rata right to buy or assign his or her right to buy when the "Shareholders" act collectively to buy all the offered BBV shares, and if they do not, then all of the offered shares may be offered to a third party. We therefore, agree with the district court that the effect of this section reflects the parties' intent that any NMBIC shareholder, by declining to exercise

their option to purchase their pro rata portion of the BBV shares and by declining to assign their option to purchase their pro rata portion to another shareholder, could prevent any other shareholder from purchasing any BBV shares and allow BBV to sell its shares to a third party.

{40} Although the Peters Group argues on appeal that the BBV Agreement is ambiguous and that they should have been allowed to give trial testimony as to the intent of the parties under this provision of the BBV Agreement, at the summary judgment hearing, the Peters Group essentially conceded this reading was also their understanding. As such, the gravamen of the Peters Group's arguments with regard to the BBV Agreement has always been Bennett's breach of fiduciary duty and the Peters Group's asserted lost opportunities: as discussed above, the Peters Group assert that they lost the opportunity to rally other shareholders to collectively purchase individually or to assign their options, and failing that route, they assert they lost the opportunity to purchase all of the BBV shares as a third-party purchaser in competition with NMBIC. The district court agreed that Bennett, as shareholder representative, had a fiduciary duty to notify the Peters Group when he notified other shareholders and the Board of Directors that BBV intended to sell, and that he breached this duty. (Issue 2). Since any effort to rally all shareholders to purchase as individuals all of the BBV shares could not succeed due to at least Bennett's and other Board members' refusal to individually purchase or assign their rights, the Peters Group would have had to purchase all the shares as a third-party purchaser. As discussed above, this opportunity was not feasible due to financial and federal approval constraints. In addition, as we have discussed above, substantial evidence supports the district court's findings and the findings support the court's conclusions that, under all the circumstances of this case, although a breach occurred, the breach was not based on conduct that falls within the exceptions to the exclusivity of the statutory appraisal remedy payable to these dissenting shareholders.

{41} We affirm the district court on this issue.

## IV. Compound Interest

{42} Section 53–15–4(F) reads, as follows:

F. The judgment shall include an allowance for interest at such rate as the court may find to be fair and equitable, in all the circumstances, from the date on which the vote was taken on the proposed corporate action to the date of payment.

In this case, the trial court awarded interest at the rate of 10% compounded annually, on the value of the shares of the Peters Group, making the following conclusion of law:

5. Pursuant to Section 53–15–4(F) NMSA 1978, the Peters Group are entitled to a fair and equitable interest rate on the fair value of the shares of the Peters Group. The Court awards ten (10) percent per annum, compounded annually, since the date of the vote on the proposed corporate action, July 23, 1996, as interest.

On cross-appeal, NMBIC does not argue against the 10% interest rate per annum award but argues that the plain meaning of the statute does not allow the district court to compound interest. NMBIC contends that the Legislature only authorized the court to set the interest "rate," i.e., the percentage to be applied to the principal, and did not authorize compounding interest. Alternatively, NMBIC argues that the statute is ambiguous, thus requiring the district court to defer to a "general rule" or "general presumptions" in contexts other than statutory dissenting shareholder appraisal rights that prejudgment interest shall be calculated as simple, not as compound interest. We are not persuaded.

{43} "Issues of statutory construction and interpretation are questions of law, which we review de novo." *Pub. Serv. Co. v. Diamond D Constr. Co.*, 2001–NMCA–082, ¶ 48, 131 N.M. 100, 33 P.3d 651; *see also Bd. of Comm'rs of Rio Arriba County v. Greacen*, 2000–NMSC–016, ¶ 4, 129 N.M. 177, 3 P.3d 672 (holding that statutory construction concerns are pure questions of law, subject to de novo review). We are mindful, however, that the plain language of the statute allows the district court broad discretion in fashion-

ing an allowance for interest that is fair and equitable in all the circumstances of the case. *See Tome Land & Improvement Co.*, 83 N.M. at 554, 494 P.2d at 967 (discussing that Section 53–15–4(F) places the awarding of interest within the discretion of the court and reviewing the award for substantial evidence.)

{44} This is not a situation where interest was awarded when no provision for interest has been provided. Nor is this a situation where the statute has expressed a maximum rate and the district court exceeded it. This is also not a situation where the parties do not agree that the term "interest rate" necessarily contemplates that the interest will accumulate either as simple or compound interest: NMBIC argues for simple interest and the Peters Group for compound. Rather, this case simply requires us to construe, in the specific context of the statutory dissenting corporate shareholder appraisal remedy, whether the words, "[t]he judgment shall include an allowance for interest at such rate as the court may find to be fair and equitable, in all the circumstances," contemplates that the district court is limited to awarding at a rate that accumulates as simple interest or whether the district court may award interest that compounds annually. Section 53–15–4(F).

{45} There is no New Mexico case that has interpreted the "fair and equitable" interest rate to be awarded under our appraisal statute or whether the term "rate" includes calculation of compound interest in the appraisal situation. A plain reading of Section 53–15–4(F), however, neither authorizes nor prohibits the award of compound interest in the corporate appraisal context. In light of the purpose of appraisal statutes, the realities of today's financial markets, the relative sophistication of those persons who perfect his or her appraisal rights, and the delay in the use of money tied up in appraisal proceedings (in this case, over ten years), we adopt the reasoning of those decisions that have allowed, in the discretion of the trial court under all circumstances of the case, interest to be compounded in the context of the statutory appraisal remedy. *See, e.g., Smith*, 114 N.M. at 343, 838 P.2d at 497

("The right to dissent from a merger or consolidation and be paid fair value is a new right that did not exist at common law, and the proceeding created by the appraisal statute is a special statutory remedy."); *see also Computer Task Group, Inc. v. Peierls*, 810 So.2d 977, 978 (Fla.Dist.Ct.App.2002) (interpreting the exact same language as allowing for compounding interest on a dissenting shareholder's award); *Sarrouf v. New England Patriots Football Club, Inc.*, 397 Mass. 542, 492 N.E.2d 1122, 1128–29 (1986) (stating that appraisal is an equitable proceeding, and the court is permitted to consider the inability of dissenting shareholders to use money tied up in proceeding in determining whether to award simple or compound interest); *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 926 (Del.Ch.1999) (stating that, "[i]t is simply not credible in today's financial markets that a person sophisticated enough to perfect his or her appraisal rights would be unsophisticated enough to make an investment at simple interest—in fact, even passbook savings accounts now compound their interest daily") (footnote omitted); *see also* Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613, 710 n. 517 (1998) ("The award of simple interest penalizes dissenting shareholders and does not accord with economic realities."); David S. Reid, *Dissenters' Rights: An Analysis Exposing the Judicial Myth of Awarding Only Simple Interest*, 36 Ariz. L.Rev. 515, 538 (1994) (discussing that, "compound interest is not simply helpful to dissenting shareholders, but rather it is mandatory to achieve full compensation for the loss of use of money").

{46} We hold that Section 53–15–4(F) of New Mexico's dissenting shareholder appraisal statute allows the award of compound interest. As such, under all the circumstances of this case, NMBIC has failed to establish that the district court abused its discretion by ruling that, "[p]ursuant to Section 53–15–4(F) NMSA 1978, the Peters Group are entitled to a fair and equitable interest rate on the fair value of the shares of the Peters Group. The [district c]ourt awards ten (10) percent per annum, compounded annually, since the date of the vote on the proposed corporate action, July 23,

1996 as interest." We therefore affirm the district court on this issue.

## CONCLUSION

{47} We affirm the district court's order and its findings and conclusions on all issues.

{48} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE and MICHAEL E. VIGIL, Judges.