734 P.2d 748 (1987)
105 N.M. 508
NEW MEXICO HOSPITAL ASSOCIATION, Plaintiff-Appellee.
v.
A.T. & S.F. MEMORIAL HOSPITALS, INC., Defendant-Appellant.
No. 16497.
Supreme Court of New Mexico.
March 3, 1987.
*749 Sutin, Thayer & Browne, P.C., John A. Bannerman, Martha J. Kaser, Frank C. Salazar, Albuquerque, for plaintiff-appellee.
Modrall, Sperling, Roehl, Harris & Sisk, P.A., R.E. Thompson, Jeffrey Twersky, Dale B. Eppler, Albuquerque, for defendant-appellant.

OPINION
WALTERS, Justice.
Plaintiff New Mexico Hospital Association (NMHA), as the representative of an unemployment compensation group fund, sued defendant A.T. & S.F. Memorial Hospitals (Memorial), a member of the fund, to recover compensatory and punitive damages for breach of a May 1982 contract entitled "Agreement to Participate in New Mexico Hospital Association Private Joint Unemployment Compensation Plan." The dispute concerns how much Memorial owed to the group fund for unemployment compensation benefits reimbursed by the fund to the State Employment Security Department for Memorial's former employees who had been laid off when Memorial closed its Albuquerque hospital.
Memorial relies on NMSA 1978, Section 51-1-13(E) (Repl.Pamp. 1983) as providing a statutory limitation to its liability to the fund, arguing as well that the contract itself limits its liability. The trial court determined that the formula in Section 51-1-13(E) was inapplicable, and that Memorial was obliged under the terms of the contract to reimburse NMHA the full amount of benefits that had been paid, plus administrative expenses incurred. The final judgment, including costs and post-judgment interest, was $261,986.97. Memorial appeals the amount awarded; NMHA cross-appeals the denial of punitive damages. We affirm.
We have not previously decided whether the formula contained in Section 51-1-13(E) of the Unemployment Compensation Act, NMSA 1978, Sections 51-1-1 to -53 (Repl. Pamp. 1983 and Cum.Supp. 1986), for computation of a group member's liability in some circumstances, is applicable to a benefit reimbursement situation as is here presented. Section 51-1-13(E) provides:
Two or more employers that have become liable for payments in lieu of contributions * * * may file a joint application for the establishment of a group account for the purpose of sharing the cost of benefits paid that are attributable to service in the employ of such employers. Each application shall identify and authorize *750 a group representative to act as the group's agent for the purpose of this subsection * * *. Upon establishment of the account, each member of the group shall be liable for payments in lieu of contributions with respect to each calendar quarter in the amount that bears the same ratio to the total benefits paid in the quarter that are attributable to service performed in the employ of all members of the group as the total wages paid for service in employment for such member during the quarter bear to the total wages paid during the quarter for service performed in the employ of all members of the group. The secretary shall prescribe regulations as he deems necessary with respect to applications for establishment, maintenance and termination of group accounts that are authorized by this subsection, for addition of new members to, and withdrawal of active members from, the accounts and for the determination of the amounts that are payable under this subsection by members of the group and the time and manner of payments.

I.
In construing an act, all parts of the act must be read together. Tudesque v. New Mexico State Bd. of Barber Examiners, 65 N.M. 42, 331 P.2d 1104 (1958). The Unemployment Compensation Act was enacted "for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." NMSA 1978, § 51-1-3 (Repl.Pamp. 1983). An underlying, but equally important, purpose of the Act is to insure that the Employment Security Department will have sufficient funds to meet the needs of unemployed workers. The Department is primarily funded by contributions from employers. Each quarter, "contributing" employers pay a fixed rate determined by adjusting a specified percentage of wages paid according to the employer's benefit experience. NMSA 1978, §§ 51-1-9, -11(H) (Repl.Pamp. 1983 and Cum.Supp. 1986). All contributions are pooled and are nonrefundable, even though no actual benefits are paid out on behalf of an individual employer. NMSA 1978, § 51-1-11(D) (Cum.Supp. 1986).
To lessen the economic burden for some organizations, the legislature has provided for exceptions to this method of funding. See NMSA 1978, §§ 51-1-13(A), -14(B), -16 (Repl.Pamp. 1983). Specifically, NMSA 1978, Section 51-1-13(A) (Repl.Pamp. 1983), permits a nonprofit employer, such as Memorial, to become a "reimbursing" rather than a "contributing" employer, and to elect to make payments "equal to the amount of regular benefits and of one-half the extended benefits paid" to employees by the Department. Id. These "payments in lieu of contributions" will ordinarily be less than the amount an employer would be required to pay as a contributing employer.
Memorial unsuccessfully argued below, and renews that argument here, that Subsection 51-1-13(E) controls the amount it is required to reimburse NMHA for payment of benefits to its former employees. That subsection, quoted above, provides that reimbursing non-profit employers may form a group "for the purpose of sharing the cost of benefits paid." Memorial says that the portion of Section 51-1-13(E) providing for each member's "payments [to the group's account] * * * in the amount * * * [bearing] the same ratio to the total benefits paid * * * [for employees] of all members of the group as the total wages paid * [to all employees of] such member * * * bear[s] to the total wages paid * * * [by] all members of the group," means that all members of the group share to some extent in paying the benefits liability of every other member. For instance, if member A's payroll constituted 1/10 of the total wages paid by all of the group members, A would only have to reimburse 1/10 of the benefits paid out, even though A's former employees may have been the only former employees receiving unemployment benefits during the period for which reimbursement was billed.
It is certainly not unreasonable to so read Subsection (E). But it cannot be read in a vacuum. If we were to accept Memorial's argument, we would have to ignore *751 and render meaningless Subsection (B) of the same statute:
B. Payments in lieu of contributions shall be made in accordance with the provisions of this subsection.
(1) At the end of each calendar quarter, or at the end of any other period as determined by the secretary, the department shall bill each nonprofit organization (or group of such organizations) which has elected to make payments in lieu of contributions for an amount equal to the full amount of regular benefits plus one-half of the amount of extended benefits paid during such quarter or other prescribed period that is attributable to service in the employ of such organization (Emphasis added.)
The above subsection very clearly requires quarterly reimbursement of full regular benefits plus one-half of extended benefits paid as are "attributable to service in the employ of such organization," both from the individual non-profit organization and from such organizations as may have formed the kind of group allowed in Subsection (E), without any mention of a ratio-based payment by members of a group. Consequently, Subsection (E)'s provisions for proportionate payment according to the total payroll ratio must refer to something other than ongoing reimbursement for benefits paid out on behalf of former employees of the group's members. We cannot interpret Subsection (E) in such a way as would make another portion of the statute  here, Subsection (B)  totally superfluous or absurd. State ex rel. Newsome v. Alarid, 90 N.M. 790, 794, 568 P.2d 1236, 1240 (1977). We construe each provision in relation to every other provision, in accord with common sense and reason, and in a manner that will not defeat the intention of the legislature. Id.
We read Subsection 51-1-13(E)'s "[u]pon establishment of the account" to mean exactly that: that at the time the account is approved and established, each member of the group shall deposit an amount that is its payable percentage according to a ratio reflected by the total quarterly wages paid by it, contrasted against the amount paid by all members of the group; and that the secretary shall prescribe by regulation the amounts, time and manner of any payments due under the subsection for the "establishment, maintenance and termination of group accounts," and for adding or dropping active members to or from the account. Unless Section 51-1-13(E) is so read, both it and Section 51-1-13(B) would refer to two different methods of funding the same function, i.e., the payment of benefits, and would be irreconcilably in conflict. By regulation the Department has determined that Section 51-1-13(E) shall apply, except in unusual circumstances, only when a group account is established or terminated.
That regulation, 421H,  the only one so far promulgated by the secretary with respect to Subsection 51-1-13(E)  lends further support to our interpretation of the statute. It provides, in relevant part:
* * * [u]pon establishment and after termination of the group account, each group member, group account and group account representative shall be fully liable for:
(1) any payment in lieu of contributions, penalties or interest required under Section 51-1-13E, N.M.S.A. 1978, for the period during which any benefits or portion thereof are payable on the basis of wage credits earned during the period of the claimant's base period employer was a group member; and
(2) the performance of the group representative.
Under the regulation, the situation before us is one where Section 51-1-13(E) simply does not apply. The membership of a group member was terminated, but the group itself has not sought termination of its account with the Department.
This construction of Section 51-1-13(E) comports with testimony offered by Department officials. Although not binding, the interpretation of a statute by the agency which administers it is persuasive. City of Raton v. Vermejo Conservancy Dist., 101 N.M. 95, 678 P.2d 1170 (1984). At trial, a Department official explained that the *752 only time the formula contained in Subsection 51-1-13(E) had been applied to NMHA was to determine the amount initially necessary to fund the Department's account. The official said further that the formula might be used otherwise to determine the ultimate liability of group members to the Department in the event a group account dissolved and all other efforts to collect from the group's agent failed. The Department's interpretation and its regulation certainly solves the possibility of an employer's dilemma in determining whether Subsection (B) or (E) applies in calculating a member's liability for benefits paid.
We hold, therefore, that the formula contained in NMSA 1978, Section 51-1-13(E), does not determine the amount of a group member's liability to the group account after that member has been terminated; rather, Section 51-1-13(E) applies to establish an initial account, and thereafter in situations where the Department is unable, for one reason or another, to collect adequate funds from a group representative to cover the liability of the group to the Department, and must look instead to all of the individual group members to cover payments made by the Department to former employees. In the instant circumstances, the requirements of Section 51-1-13(B) establish Memorial's liability.

II.
In the alternative, Memorial urges that the contract between Memorial and NMHA contains two provisions that limit a group member's liability to the group. Sections 7 and 8 of the contract address the annual adjustments that NMHA may make to a member's account to insure that it will have adequate funds to cover its projected liability to the Department. Section 7 allows the group representative to uniformly raise the rates participating hospitals are required to pay to the group fund, provided that this amount is not "greater than the tax which could be charged the Hospital by the Department, using the maximum percentage rate being charged by the Department to any employer in New Mexico in that year." Section 8 details how NMHA arrives at the amount an individual group member must pay into the fund. Members who have a high number of claims against them may be required to pay the fund at a higher percentage rate than members with fewer claims, also limited to an amount not "greater than the tax which could be charged the Hospital by the Department using the maximum percentage rate being charged by the Department to any employer in New Mexico in that year" unless all participating hospitals are required to pay at a higher rate. At all times relevant to this lawsuit, the maximum amount charged by the Department was 4.2% and no attempt was made by NMHA to require all members to pay additional amounts. Thus, Memorial argues, its maximum liability to the group fund is 4.2% of its base wages for the time period in question.
Those provisions, however, no longer apply to Memorial. They provide the means for NMHA to adjust the payment schedules of active group members so that the group will have sufficient funds to cover its anticipated liability to the department. The percentage ceiling imposed by those provisions simply ensures the participating hospitals that the rates charged by NMHA will not exceed the amount they could be charged directly by the Department. NMHA sent Memorial a written notice of exclusion by a letter dated May 6, 1983. Exclusion from the group fund became effective 30 days thereafter. Section 10 governing exclusion, then, is the correct contractual provision to apply to Memorial:

Exclusion: The Board shall have the authority, subject to the Unemployment Compensation Law, to exclude the Hospital from further participation in the Plan after 30 days written notice if the Hospital refuses to make payments, make timely reports requested by NMHA, the Board or the Administrator in connection with the Plan, or otherwise interferes with or impedes the efficient administration of the Plan. Any Hospital so excluded shall remain liable to pay the Fund the amount of any deficit in its Account and shall have the right to any balance in its Account, in the same *753 manner as if the Hospital withdrew. (Emphasis added.)
This section necessarily refers us to the provision governing procedures upon withdrawal, exclusion, or termination. Section 9 of the contract provides, in part:
C. If the Hospital's Account, computed after provision for payments to the Department and its share of Plan operating expenses, is determined to contain any unallocated funds, these funds shall be paid to the Hospital within 30 months [sic] after the termination date. If the Hospital's account, similarly calculated, shows a deficit, then the Hospital shall pay the Fund, within 30 days after demand, the amount of the estimated deficit and any actual remaining deficit within 15 days after notice of the deficit amount. (Emphasis added.)
With respect to computation of any hospital's "account," a portion of Section 6 of the contract reads:
B. The Administrator shall keep a separate account for the Hospital (hereinafter called an "Account") which shall show:
(1) The amounts paid by the Hospital into the Fund.
(2) The Hospital's share of any income or loss from investment of the Fund.
(3) The amounts paid from the Fund to the Department for benefits paid by the Department attributable to the Hospital.

(4) The Hospital's share of Plan operating expenses paid from the Fund. (Emphasis added.)
By the express terms of its agreement with NMHA, Memorial's account surplus or deficit at the time of exclusion would show the amount of benefits paid to the Department on its behalf by NMHA, as well as its share of administrative expenses, offset by whatever Memorial had already paid into the fund and its share of investment income (or loss). The judgment entered by the district court accurately reflects this calculation; accordingly, the terms of the contract will not operate to alter the judgment.

III.
NMHA's cross-appeal alleges error in the district court's refusal to assess punitive damages against Memorial. It relies on a finding of intentional conduct on the part of Memorial to deceive NMHA and so to avoid the full extent of its liability to the fund, as sufficient to support an award of punitive damages. Memorial points to deletion by the court of such language as "reckless," "willfully," "willful," "intent to mislead and deceive," and "intent not to fully disclose" from some of NMHA's requested findings to argue insufficient evidence. They cite the rule that refusal to accept a requested finding constitutes a finding to the contrary. Although that may be a correct statement, Thornton v. Hesselden Construction Co., 80 N.M. 121, 452 P.2d 190 (1969), it overlooks the findings in this case which do use that or language of like import in characterizing Memorial's conduct.
Punitive damages, however, are not awarded as a matter of right, but lie within the discretion of the court. Padilla v. Lawrence, 101 N.M. 556, 685 P.2d 964 (Ct. App.), cert. denied, 101 N.M. 419, 683 P.2d 1341 (1984). We are concerned only with abuse of discretion, which requires a showing that the court's ruling was contrary to logic and reason. Three Rivers Land Co., Inc. v. Maddoux, 98 N.M. 690, 652 P.2d 240 (1982).
Even though we have held that punitive damages may be recovered in contract actions, Hood v. Fulkerson, 102 N.M. 677, 699 P.2d 608 (1985), normally they are awarded only when the breach is maliciously intentional, fraudulent or oppressive, or committed recklessly or with a wanton disregard of rights of the party injured. Ranchers Exploration and Development Corp. v. Miles, 102 N.M. 387, 696 P.2d 475 (1985). Despite the district court's conclusion that Memorial intentionally misled NMHA and breached its contract, it refused to impose punitive damages. A trial court is not required to award such damages. Merritt v. De Los Santos, 721 F.2d 598 (7th Cir.1983). We will not substitute our judgment for that of the trial court, *754 nor consider whether we would have reached the same conclusion. Edington v. Alba, 74 N.M. 263, 392 P.2d 675 (1964); Coastal Plains Oil Co. v. Douglas, 69 N.M. 68, 364 P.2d 131 (1961).
We affirm the judgment in all respects. IT IS SO ORDERED.
SOSA, Senior J., and RANSOM, J., concur.