2008-NMSC-039

188 P.3d 1185

The **PETERS CORP.**, Milo L. McGonagle, Jr., and E.W. Sargent, Respondents–Counterclaimants–Third–Party Plaintiffs and Petitioners–Cross–Respondents,

v.

**NEW MEXICO BANQUEST INVESTORS CORPORATION**, Petitioner–Counterdefendant and Respondent–Cross–Petitioner,

v.

Edward B. Bennett, Third–Party Defendant–Respondent.

No. 30,292.

Supreme Court of New Mexico.

June 24, 2008.

Freedman, Boyd, Hollander, Goldberg & Ives, P.A., Joseph Goldberg, Michael Lee Goldberg, John Warwick Boyd, Albuquerque, NM, C. Mott Woolley, Esq., Clarence Mott Woolley, Santa Fe, NM, for Respondents–Counter–Claimants–Third–Party Plaintiffs and Petitioners–Cross–Respondents.

Tucker Law Firm, P.C., Steven L. Tucker, Santa Fe, NM, for Petitioner–Counter–Defendant and Respondent–Cross–Petitioner.

Brennan & Sullivan, P.A., Michael W. Brennan, Santa Fe, NM, for Third–Party Defendant–Respondent.

## OPINION

BOSSON, Justice.

■ {1} In *McMinn v. MBF Operating Acquisition Corp. (McMinn II),* 2007–NMSC–040, 142 N.M. 160, 164 P.3d 41, we recently interpreted New Mexico's dissent and appraisal statute, which gives shareholders who dissent from certain corporate transactions the right to receive fair value for their shares from the corporation. *See* NMSA 1978, § 53–15–3 (1983); *McMinn II,* 2007–NMSC–040, ¶ 2. We held that Section 53–15–3(D), which purports to make appraisal the exclusive remedy for shareholders who possess such statutory rights, does not apply to conflict-of-interest merger transactions designed by controlling shareholders to eliminate the interests of non-controlling shareholders in the corporation. *McMinn II,* 2007–NMSC–040, ¶ 51. Thus, when a non-controlling shareholder's interest in a company is eliminated by such a transaction, known as a "freeze-out" merger, that shareholder will not be limited to an appraisal, and may file suit against the controlling shareholders for breach of fiduciary duty.

{2} This appeal raises questions about the reach of *McMinn II* beyond the context of freeze-out mergers, as well as the impact of that opinion on a judge's discretion not to award punitive damages or equitable remedies in addition to the appraisal remedy. Specifically, we decide whether our holding in *McMinn II,* that the exclusivity provision of the New Mexico dissent and appraisal statute does not apply to freeze-out merger transactions, extends to other types of appraisal-triggering events. We also decide whether a district court, having awarded the appraisal remedy to the dissenting shareholders, must award additional remedies such as disgorgement of profits or punitive damages if the court finds that a controlling shareholder has breached his fiduciary duty.

{3} We hold that *McMinn II* does not apply to the stock redemption transaction in this case, and thus the exclusivity provision applies. Though the exclusivity provision contains an exception for unlawful or fraudulent conduct, the dissenting shareholders did not prove a breach of fiduciary duty rising to that level. We therefore affirm the decision of the district court and the Court of Appeals that the dissenting shareholders were not entitled to punitive damages or equitable remedies beyond the appraisal remedy of fair value for their shares.

## BACKGROUND

{4} A full exposition of the facts is contained in the Court of Appeals opinion. We therefore relate only those facts that are relevant to our decision here. *See N.M. Banquest Investors Corp. v. Peters Corp.,* 2007–NMCA–065, ¶¶ 3–10, 141 N.M. 632, 159 P.3d 1117.

{5} In 1982, New Mexico Banquest Investors Corporation (NMBIC) was formed as a second-tier holding company owning 100% of the stock of New Mexico Banquest Corporation (Banquest), which in turn owned 100% of the stock of First National Bank of Santa Fe (First National). At that time, the Peters Corporation, Milo L. McGonagle, Jr., and E.W. Sargent (collectively the Peters Group), owned a minority interest in Banquest, and Edward B. Bennett (Bennett) owned a controlling interest in Banquest. *See id.* ¶ 2. NMBIC is a close corporation formed in part to facilitate a $10 million investment by Banco Bilbao de Vizcaya (BBV), as successor to Banco de Vizcaya, a Spanish bank. *Id.*

{6} In 1983, Bennett and certain other shareholders, including the Peters Group, executed a Shareholder Agreement which placed management and control of NMBIC in Bennett, entrusted Bennett with board-selection powers, and gave the shareholders the right to purchase shares offered for sale by other shareholders, except BBV. The possible future purchase or sale of NMBIC shares by BBV was governed by a separate agreement (the BBV Agreement), also executed in 1983. The BBV Agreement has several critical features relevant to this dispute: (1) the signatory shareholders, collectively, had the option to buy, on a pro rata basis, "all (but not less than all)" of BBV's offered shares; (2) each shareholder's option was transferrable to other shareholders; (3)

each shareholder had no obligation either to buy shares or to transfer the option to buy; (4) BBV was not obligated to sell any of its offered shares unless the shareholders exercised their options to buy *all of* those shares; and (5) unless the shareholders bought all of the offered shares, BBV was free to sell all of those shares to a third party. *See id.* ¶ 4. Thus, the evident purpose of the BBV Agreement was to ensure that BBV could sell its entire block of offered shares in a single transaction and thereby avoid getting embroiled in shareholder disputes over such a sale.

As of June 30, 1996, there were 502,589 NMBIC shares outstanding with a total of 68 shareholders in twelve states and two foreign countries. Regarding the stock interests of the NMBIC shareholders relevant to this dispute, BBV owned 198,913 shares or a 39.6% interest; the Peters Corporation owned 19,526 shares or a 3.88% interest; Milo McGonagle owned 2,506 shares or a 0.5% interest; E.W. Sargent owned 2,000 shares or a 0.4% interest; Bennett owned 88,897 shares or a 17.7% interest; and Bennett's family members owned 22,026 shares or a 4.4% interest in NMBIC at the time. Bennett was president of NMBIC, chairman of the board of directors, and controlling shareholder in NMBIC. He was also president of [First National] and chairman of the board of directors of [First National]. The Peters Group were minority shareholders in NMBIC, and at the time they exercised their dissenters' rights in August 1996, they had been NMBIC shareholders for about thirteen years.

*Id.* ¶ 3.

{7} In 1995, BBV decided to sell its interest in NMBIC as anticipated in the BBV Agreement. Under the BBV Agreement, Bennett was appointed by the other shareholders to receive notice from BBV of BBV's intent to sell its shares, and thus, BBV informed Bennett of its intent. *Id.* ¶ 5. Bennett determined that the best way to structure the transaction was for BBV to sell its shares to NMBIC as a "third party," within the meaning of the BBV Agreement, in a stock-redemption transaction, and not to individual shareholders of the corporation. Thus, Bennett decided that he and his family would not purchase the BBV shares and would not assign their options to purchase. *Id.* ¶ 5. "Several other NMBIC Board members also determined that they would not individually purchase or assign their rights to purchase their pro rata portion of the BBV shares, leaving the door open for an NMBIC redemption of the shares as a third party." *Id.* ¶ 6. The district court found that Bennett structured the redemption transaction for legitimate business purposes, which were: "(1) the establishment of an employee stock option plan; (2) the tax benefits of a redemption over purchase by [individual shareholders]; (3) the financial efficiency of a redemption; (4) the elimination of the possibility that the shares would fall into the hands of an unfriendly third party; (5) the broadening of the shareholder base; and (6) to provide stability and continuity of management." *Id.* ¶ 5.

{8} Although Bennett had discussed the sale with counsel, the Board of Directors, and some NMBIC shareholders, Bennett did not initially disclose anything to many other shareholders, including the Peters Group. *Id.* ¶ 7. Bennett decided not to disclose to these shareholders BBV's desire to sell its shares based on advice from an attorney that such notification would be futile. The attorney reasoned that because the BBV agreement required unanimity among the shareholders in electing to purchase the BBV's shares, the decision on the part of any shareholder not to exercise or assign his option to buy would render the remaining shareholders unable to do so as well. Thus, because Bennett and other NMBIC Board members had already decided not to buy their pro rata share of BBV's stock or assign their options to buy, the Peters Group would be unable to do so, and any notice given to the Peters Group would not make a difference to the transaction. The district court found that Bennett intentionally delayed notifying the Peters Group of the BBV transaction, and that he did so "because he feared litigation from Gerald Peters, who was at all times the president and principal shareholder of The Peters Corp."

{9} On May 9, 1996, BBV and NMBIC executed a written letter of intent, whereby BBV would sell all of its NMBIC shares to NMBIC for twice book value. *Id.* "The Peters Group was first notified in proxy materials noticing a special shareholders' meeting sent to the NMBIC shareholders on July 10, 1996." *Id.* ¶ 7. At the NMBIC shareholders' meeting on July 23, 1996, all NMBIC shareholders except the Peters Group and one other shareholder holding a 1.2% interest in NMBIC declined to exercise their individual rights of first refusal or assign such rights, and instead ratified NMBIC's redemption of the BBV shares. *Id.*

{10} "NMBIC purchased BBV's interest in NMBIC for twice book value as of December 31, 1995, or $82.13 per share, for a total of $16,336,000." *Id.* ¶ 8. To finance the purchase of BBV's shares, NMBIC issued additional shares and sold 80,000 of those new shares to the Employee Stock Ownership Plan (ESOP) at $56 per share and 107,500 of the new shares to other investors, including Bennett, at the same price. No existing shareholder who expressed a desire to buy new shares at $56 was refused. "The Peters Group dissented from the redemption, decided not to remain NMBIC shareholders, and immediately sought to obtain fair value of their NMBIC shares under [NMSA 1978, Section 53–15–4 (1983) ]." *Id.* ¶ 7.

{11} A dispute arose between NMBIC and the Peters Group concerning the fair value of the Peters Group's shares, and NMBIC petitioned the district court for an appraisal to determine their fair value. *Id.* ¶ 9; *see* § 53–15–4 (providing the requisite procedures for the appraisal proceeding and stating that in the event no agreement can be reached as to fair value, either the corporation or the dissenting shareholder may petition the Court for an appraisal). *Id.* The Peters Group filed an answer and counterclaim, along with a third-party complaint against Bennett, asserting fraud, breach of fiduciary duty, and breach of contract, and asking for rescission and punitive damages. The district court granted summary judgment in favor of NMBIC on the Peters Group's breach of contract claim, and the parties proceeded to a bench trial on the remaining counterclaims and third-party claims.

{12} After trial, the district court entered findings and conclusions and awarded the Peters Group their statutory appraisal remedy at $99.52 per share. *Peters Corp.,* 2007–NMCA–065, ¶ 10. The court declined either to subtract value for shares that represent a minority interest (known as a minority discount) or to add value for shares that carry the power to control a corporation (known as a control premium). *Id.* The fair value award included interest at 10% compounded annually. *Id.*

{13} Important to this appeal, the district court found that Bennett had breached his fiduciary duty to the Peters Group by informing the NMBIC Board of Directors and other shareholders, but not the Peters Group, of BBV's intent to sell its shares to the corporation. *Id.* However, the district court determined that the breach did not involve fraud or self-dealing, finding instead that the redemption transaction was motivated by legitimate business and financial concerns for the welfare of the corporation, rather than the entrenchment of Bennett. *Id.* "The district court also [found] that the Peters Group could not detrimentally rely on the lack of notice and that the breach did not cause damages to the Peters Group or grant a windfall to NMBIC or Bennett." *Id.* Therefore, the district court declined to award any damages or other relief to the Peters Group beyond the statutory appraisal remedy of $99.52 per share. *Id.*

{14} The Peters Group appealed the district court's denial of punitive damages or equitable remedies for breach of fiduciary duty, as well as the court's decision not to include a control premium in calculating the fair value of the Peters Group's shares, and the grant of summary judgment on the Peters Group's breach of contract claim under the BBV Agreement. *Id.* NMBIC cross-appealed, contending that the district court should have awarded only simple interest on the appraisal remedy instead of interest compounded annually. *Id.* The Court of Appeals affirmed the district court on all issues. *Id.* ¶ 1. We granted certiorari to address certain statements made by the Court of

Appeals in reliance on its opinion in *McMinn v. MBF Operating, Inc.*, 2006–NMCA–049, 139 N.M. 419, 133 P.3d 875 (*McMinn I* ), that conflict with our opinion in *McMinn II* reversing *McMinn I.*

## DISCUSSION

### Breach of Fiduciary Duty

{15} The district court found that Bennett breached his fiduciary duty to the Peters Group by failing to timely disclose BBV's intent to sell its shares and other information relating to the redemption transaction. The court nonetheless declined to award punitive damages or to order the equitable remedy of disgorgement of profits, reasoning that Bennett's breach did not cause harm to the Peters Group. Specifically, the court found that even if they had been timely informed of BBV's offer, the Peters Group would have had to purchase *all* the BBV shares, worth over $16 million. This was not something that the Peters Group were ready, willing, and able to do. *Peters Corp.*, 2007–NMCA–065, ¶ 30. Further, the district court found that any attempts by the Peters Group to purchase the entire block of BBV stock "would have faced rigorous scrutiny by the Federal Reserve Board." *Id.* ¶ 31.[1] Thus, the Peters Group ultimately could not have secured federal approval within the short time period required under the BBV Agreement to purchase BBV's stock and prevent its sale to outside parties. *Id.* ¶ 32.

{16} The Court of Appeals affirmed the district court's decision not to award damages or provide equitable relief for Bennett's breach of fiduciary duty. However, the Court of Appeals based its decision on a ground not argued in the district court or on appeal, namely that Bennett's breach "occurred in the kind of 'freeze-out' transaction that the statutory appraisal remedy was designed for as the exclusive remedy." *Id.* ¶ 33. In reaching this conclusion, the Court of Appeals relied on its opinion in *McMinn I,* an opinion that we later reversed in *McMinn II.*

{17} The Peters Group now argues that *McMinn II* compels a different result than

that reached by the Court of Appeals below. Specifically, the Peters Group argues that *McMinn II* required the district court, upon finding that Bennett breached his fiduciary duty to the Peters Group, to provide a separate remedy beyond appraisal of fair value for the Peters Group's shares. We are not persuaded. While we agree that some of the language used by the Court of Appeals in this case has been rendered incorrect by our opinion in *McMinn II,* that opinion does not undermine the result reached by the Court of Appeals. Thus, although we correct the problematic language, we affirm the Court of Appeals and the district court on the issue of damages for Bennett's breach of fiduciary duty.

{18} Before we begin our analysis, it will be useful to discuss in some detail our opinion in *McMinn II,* as the proper application of that case to the facts here forms the central point of contention between the parties on certiorari.

### *McMinn II*

{19} In *McMinn II,* the controlling shareholders of MBF Manufacturing (MBF), a closely-held corporation with only three shareholders, instituted a merger transaction designed to eliminate the interest of McMinn as the non-controlling shareholder. *McMinn II,* 2007–NMSC–040, ¶¶ 8–10. Known as a "freeze-out" transaction, the merger was accomplished by the controlling shareholders setting up a shell corporation owned by them alone, and then causing MBF to merge with the shell corporation. *Id.* ¶ 1. One condition of this merger was the elimination of McMinn's interest by the forced cancellation of his shares through a cash purchase. *Id.* ¶¶ 8–10. Prior to the merger, McMinn had complained that the controlling shareholders were paying themselves excessive salaries and improperly refusing to declare dividends to the shareholders. *Id.* ¶ 7.

{20} After the freeze-out transaction was complete, McMinn rejected the amount offered for the fair value of his shares and filed

---

1. The court found that Mr. Peters' substantial shareholder stake in a rival Santa Fe bank might have raised serious federal regulatory concerns regarding competition, and in any case would have taken time to secure federal approval.

suit for breach of fiduciary duty against MBF and the controlling shareholders. *Id.* ¶¶ 10–11. A jury found that the controlling shareholders had breached their fiduciary duties to McMinn and awarded McMinn the fair value of his shares as calculated by his expert, taking into account the loss of value to the corporation caused by the payment of excessive salaries, along with $20,000 in punitive damages. *Id.* ¶¶ 12, 46–47. On appeal, MBF argued that the statutory appraisal remedy was McMinn's exclusive remedy, and thus McMinn was bound by the amount offered by MBF because he failed to follow the proper procedures for seeking an appraisal. *See id.* ¶ 13.

{21} The exclusivity provision of New Mexico's dissenter's rights statute provides that

> [a] shareholder of a corporation who has a right under this section to obtain payment for his shares shall have no right at law or in equity to attack the validity of the corporate action that gives rise to his right to obtain payment, nor to have the action set aside or rescinded, except when the corporate action is unlawful or fraudulent with regard to the complaining shareholder or to the corporation.

Section 53–15–3(D). Interpreting this provision, the Court of Appeals in *McMinn I* agreed with MBF, holding that appraisal was McMinn's exclusive remedy and that the allegations of breach of fiduciary duty on the part of the controlling shareholders were insufficient to bring the case within the statutory exception to exclusivity for "fraudulent or unlawful" conduct. *McMinn I*, 2006–NMCA–049, ¶¶ 29–36. Thus, the Court of Appeals vacated the jury verdict in McMinn's favor. *Id.* ¶ 36.

{22} We reversed the Court of Appeals and held that appraisal is not the exclusive remedy in freeze-out transactions designed to eliminate the interest of minority or non-controlling shareholders. *McMinn II*, 2007–NMSC–040, ¶¶ 13, 54. We began by examining certain fundamental principles of corporate law relating to fiduciary duties, noting that the transaction designed by the controlling shareholders of MBF, "whereby they caused the original corporation to merge with a shell corporation also controlled by them and created for their benefit," was a conflict of interest transaction. *Id.* ¶¶ 18–21. We observed that such transactions "are traditionally held up to careful scrutiny under fiduciary duty principles implicating the duty of loyalty." *Id.* ¶ 21. We then reviewed both the language and the purpose of the New Mexico dissent and appraisal statute to determine whether the Legislature intended that a former shareholder, whose interest in a company had been eliminated by a freeze-out merger, was relegated to an appraisal action as his sole remedy. *Id.* ¶¶ 23–30. If the Legislature intended to limit the relief in a freeze-out transaction, then the shareholder, upon failing to follow the statutory procedures for seeking an appraisal, would be bound by the offer made by the corporation for the value of his shares. *See* § 53–15–4(A) (stating that any shareholder who fails to make a demand for payment for his shares within the prescribed time "shall be bound by the term of the proposed corporate action").

{23} Section 53–15–4(B) provides that when a shareholder does not file a demand for an appraisal, his right to appraisal ceases and he is restored to his shareholder status. *See McMinn II*, 2007–NMSC–040, ¶ 24. However, if the transaction that triggers the shareholder's appraisal rights is designed to force him to surrender his interest in the corporation and accept cash for his shares, then it is impossible for him to be "restored" to his shareholder status. *Id.* ¶ 26. Thus, we observed that, as applied to merger transactions, the statute appears to be designed for an arms-length merger between two unrelated corporations, as opposed to a merger between two corporations under common control for the sole purpose of eliminating the interests of the non-controlling shareholder. *Id.* ¶ 31. If the statutory appraisal remedy were the exclusive remedy for non-controlling shareholders whose interests are eliminated by a freeze-out merger transaction, the statute could be used by those in control to oppress the minority while escaping the close scrutiny typically accorded transactions involving conflicts of interest and self-dealing. *Id.* ¶¶ 29–30.

### Application of *McMinn II* to This Case

{24} For several reasons, the rationale of *McMinn II* simply does not apply in this case. First and foremost, the stock redemption transaction designed by Bennett for the purchase of BBV's shares in no way resembles the freeze-out merger in *McMinn II.* The Court of Appeals, relying on its previous opinion in *McMinn I,* incorrectly characterized the transaction in this case as a "freeze-out" transaction. *See Peters Corp.,* 2007–NMCA–065, ¶ 33 (stating that Bennett's breach of fiduciary duty "occurred in the kind of 'freeze-out' transaction that the statutory appraisal remedy was designed for as the exclusive remedy"). The term "freeze-out," as it was used in *McMinn II,* refers to a "corporate transaction[ ] in which the majority expels the minority stockholders from the company and requires them to accept cash, notes, or other property for their shares." Stephen J. Paine, *Achieving the Proper Remedy for a Dissenting Shareholder in Today's Economy: Yuspeh v. Koch,* 65 La. L.Rev. 911, 911 (Winter 2005). That was the only type of "freeze-out" transaction addressed by *McMinn II,* and that is not this case.

■ {25} Unlike the merger in *McMinn II,* which was a true "freeze-out" of the non-controlling stockholder, the stock redemption transaction structured by Bennett and the NMBIC Board of Directors did not eliminate the Peters Group's interest in the company and force them to accept cash for their shares. The Peters Group was dissatisfied with the decision on the part of Bennett and the majority of the NMBIC shareholders not to buy BBV's shares directly, which would have allowed the Peters Group to participate in the purchase pro rata. The Peters Group reacted by leaving, electing to surrender their shareholder status and be cashed out. The Peters Group could just as well have retained their interests in the corporation, in which case they would have been in the same position as all the other shareholders, including Bennett, in terms of any benefits or losses resulting from the stock redemption transaction. In a word, the Peters Group was not "frozen-out" of anything.

■ {26} Also in contrast to the freeze-out merger in *McMinn II,* NMBIC's stock redemption did not involve a conflict of interest that would create a presumption of self-dealing. When a corporate fiduciary, such as a director or controlling shareholder, has a direct or indirect interest in a transaction with the corporation, courts will view it with a high level of scrutiny to ensure that fairness. *See Mayeux v. Winder,* 2006–NMCA–028, ¶ 20, 139 N.M. 235, 131 P.3d 85 (quoting *Cleary v. Cleary,* 427 Mass. 286, 692 N.E.2d 955, 958 (1998), for general rule that "one acting in a fiduciary capacity for another has the burden of proving that a *transaction with himself* was advantageous for the person for whom he was acting" (quoted authority omitted)).

{27} The Peters Group incorrectly asserts that the stock redemption transaction between NMBIC and BBV creates a facial presumption of self-dealing, in contrast to cases where "the plaintiff participated in management and in the transactions in question," citing to *Mayeux,* 2006–NMCA–028, ¶¶ 19–20, for this proposition. The distinguishing point in *Mayeux,* however, was not the fact of the plaintiff's participation in management or the challenged transactions; rather, *Mayeux* pointed to the nature of a transaction as one where the fiduciary conducted a transaction *with himself* as the factor that creates a presumption of self-dealing. *Id.* The Peters Group has not demonstrated that Bennett or NMBIC stood on both sides of the transaction with BBV. Thus, there is no presumption of self-dealing in this case that would shift the burden to the defendants to show that the transaction did not constitute a breach of fiduciary duty.

{28} The transaction in this case was conducted at arms length between two unrelated entities, NMBIC and BBV, and, as we discuss later in this Opinion, was governed by an unambiguous shareholders agreement. The district court found that Bennett's motivations in structuring the stock redemption transaction were legitimate and based on valid business concerns for NMBIC, to which Bennett also owed a fiduciary duty. As we noted in *McMinn II,* this is precisely the

type of situation for which the appraisal remedy was designed. 2007–NMSC–040, ¶ 28 ("Appraisal statutes were designed to protect dissenting shareholders by allowing them a 'way out' of an investment involuntarily altered by a fundamental corporate change."). Thus, unlike the transaction in *McMinn II,* the exclusivity provision of the appraisal statute would apply to the stock redemption transaction in this case.

{29} Of course, the exclusivity provision does contain an exception for unlawful or fraudulent conduct. *See* § 53–15–3(D) (stating that a shareholder who has dissenters' rights under the appraisal statute "shall have no right at law or equity to attack the validity of the corporate action that gives rise to his right to obtain payment ... *except when the corporate action is unlawful or fraudulent with regard to the complaining shareholder or to the corporation* " (emphasis added)). In *McMinn II,* we held that, even if the exclusivity provision applied to the freeze-out transaction in that case, the conduct alleged by McMinn fell within the statutory exception, and McMinn had proved that he was entitled to both compensatory and punitive damages for the breach. *McMinn II,* 2007–NMSC–040, ¶ 36. However, *McMinn II* does not stand for the proposition that a shareholder pursuing a claim for breach of fiduciary duty alongside an appraisal action must always recover something beyond the fair value of his shares.

■ {30} Indeed, as we noted in *McMinn II,* "the proper remedy in a breach of fiduciary duty action involving the squeeze-out of a non-controlling shareholder in a close corporation is *compensatory damages measured by the fair value of the former shareholder's shares.*" *Id.* ¶ 47 (citing *Walta v. Gallegos Law Firm, P.C.,* 2002–NMCA–015, ¶¶ 28, 66, 131 N.M. 544, 40 P.3d 449) (emphasis added). Thus, *McMinn II* simply allows the shareholder to make a case that, under the exception to exclusivity, (1) the controlling shareholders breached a fiduciary duty, and (2) that breach rose to the level of unlawful or fraudulent, entitling the shareholder to a remedy beyond the fair value of his shares, such as punitive damages or disgorgement of profits. The Peters Group got to make their

case; *McMinn II* does not mandate that they win it. We now evaluate the district court's decision not to award equitable relief or punitive damages under the applicable standard of review.

**Remedies Beyond Appraisal Value**

{31} Notwithstanding Bennett's breach of fiduciary duty, the district court decided not to award punitive damages or to order Bennett and NMBIC to disgorge profits. The Peters Group sees this as the court effectively sanctioning Bennett's wrongdoing, allowing him and NMBIC to profit from such wrongdoing. Thus, according to the Peters Group, the court's decision violated the maxim "for every wrong there is a remedy." We agree that Bennett committed a wrong. We disagree, however, with the notion that the Peters Group has been left without a remedy. As we have noted, the Peters Group received fair value for their shares, which is the measure of compensatory damages for breach of fiduciary duty. We also fail to see any causal connection between Bennett's conduct and the profit made by additional purchases of stock. Additionally, we note a fundamental problem with the Peters Group's argument; namely, it disregards the primary importance of the district court's discretion in awarding punitive damages or ordering equitable remedies.

*Disgorgement*

■ {32} Disgorgement is an equitable remedy whereby a wrongdoer is forced to give up the benefits obtained as a result of his wrongdoing. *See S.E.C. v. Huffman,* 996 F.2d 800, 802 (5th Cir.1993) ("Disgorgement wrests ill-gotten gains from the hands of a wrongdoer."). The remedy may not be used punitively, and thus a causal connection must exist between the breach and the benefit sought to be disgorged. *See S.E.C. v. UNIOIL,* 951 F.2d 1304, 1306 (D.C.Cir.1991) ("The touchstone of a disgorgement calculation is identifying a causal link between the illegal activity and the profit sought to be disgorged."); *Wellman v. Dickinson,* 682 F.2d 355, 368 (2d Cir.1982) ("[T]he loss complained of must proceed *directly* and proximately from the violation claimed and not be

attributable to some supervening cause."); *S.E.C. v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978) ("Disgorgement is remedial and not punitive. The court's power to order disgorgement extends only to the amount ... by which the defendant profited from his wrongdoing."). The decision whether to order a defendant to disgorge profits and the amount of profits to be disgorged rests within the sound discretion of the trial court. *See United Props. Ltd. v. Walgreen Props., Inc.,* 2003–NMCA–140, ¶ 7, 134 N.M. 725, 82 P.3d 535 ("[T]he issue of how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion." (emphasis added) (quoted authority omitted)).

{33} The premise of the Peters Group's argument for disgorgement rests on the difference between (1) the price at which NMBIC was able to buy BBV's stock, as well as the price at which Bennett and other shareholders were able to buy the new shares issued by NMBIC to finance the BBV–NMBIC transaction, and (2) the price fixed by the district court in the appraisal proceeding as the fair value of the Peters Group's shares. According to the Peters Group, both Bennett and NMBIC benefitted from Bennett's breach by securing the ability to purchase NMBIC shares at a lower price than the $99.52 per share value fixed by the court in the appraisal proceeding for the Peters Group's shares. Specifically, NMBIC purchased shares appraised by the court at $99.52 each for only $82.13 (the price NMBIC paid BBV for its shares), and Bennett purchased shares worth $99.52 each for only $56.00 (the price of the new shares issued to finance the BBV stock redemption transaction). This led to an aggregate "profit" of at least $3,459,097.07 for NMBIC and at least $233,136.64 for Bennett. The Peters Group argues that the district court should have required NMBIC and Bennett to disgorge these amounts, and pay them to the Peters Group. *See Peters Corp.,* 2007–NMCA–065, ¶¶ 24–25.

{34} However, as the district court observed, the Peters Group could not show a causal connection between Bennett's failure to disclose BBV's intention to sell its shares

and the benefits obtained by Bennett and NMBIC. In other words, the Peters Group did not demonstrate that but for Bennett's failure to notify them of the prospective sale of the BBV shares the stock redemption transaction would not have proceeded in the same manner. NMBIC would have redeemed its stock at the same price and Bennett would have purchased stock at the same price, whether or not Bennett had timely notified the Peters Group of the intended sale.

{35} At trial, the evidence presented did not persuade the court that the Peters Group, if properly notified, could have purchased all the BBV shares for themselves and benefitted from the same price differentials. As noted by the Court of Appeals, the following findings were supported by substantial evidence: (1) "[E]ven if they had been timely informed of BBV's intention to sell its shares, the Peters Group were not ready, willing and able to purchase all the BBV shares, which NMBIC purchased as a corporate redemption for $16,336,000," *Peters Corp.,* 2007–NMCA–065, ¶ 30 (internal quotations omitted); (2) any attempts made by the Peters Group to purchase BBV shares would have been rigorously scrutinized by the Federal Reserve Board and the U.S. Department of Justice because "in 1996 the other activities of the Peters Corporation were 'non-permissible' businesses for a bank holding company, the Peters Corporation capital structure would have weakened NMBIC[ ]" even if the Peters Group were willing and able to purchase the BBV shares, "and [Gerald] Peters' ownership of a competing bank in Santa Fe would raise antitrust concerns," *id.* ¶ 31; and (3) because of these concerns, BBV would not have sold its shares to the Peters Group even if they had been ready, willing and able to purchase those shares, "particularly in light of the timelines under the BBV Agreement and the delay in obtaining federal approval for the sale," *id.* ¶ 32.

{36} The Peters Group counters by suggesting to this Court that, if timely notified, they could have instituted litigation that "could have delayed or derailed the transaction," and therefore the transaction would

not have occurred the same way and Bennett and NMBIC would not have been unjustly enriched. However, this is not what the Peters Group argued below. During the course of the proceedings, the Peters Group did not argue that the nature of the harm they sustained was somehow losing an opportunity to oppose the transaction by filing a lawsuit. Rather, the Peters Group argued that they lost the opportunity to buy all the BBV shares as a third party—an opportunity that NMBIC ultimately took advantage of. Of course, as we have explained, the Peters Group was unable to persuade the district court that they ever could have completed such a purchase.

{37} We also observe that the trial court never made any findings, nor was it asked to do so, regarding the effect of Bennett's breach on a potential lawsuit. Accordingly, we will not address on certiorari an argument not presented to the trial court. We do note, however, that vague speculation about the outcome of a hypothetical lawsuit attacking the transaction or the BBV Shareholders Agreement does not establish any concrete loss to the Peters Group resulting from Bennett's failure to inform them of BBV's intent to sell. Such speculation cannot form the basis for compensatory damages, let alone equitable remedies that are awarded at the discretion of the trial court. *See City of Santa Fe v. Komis,* 114 N.M. 659, 662, 845 P.2d 753, 756 (1992) (" 'Damages which are speculative, conjectural, or remote are not to be considered for compensation.' " (quoting *Ryan v. Kansas Power & Light Co.,* 249 Kan. 1, 815 P.2d 528, 535 (1991))); *Glotzbach v. Froman,* 854 N.E.2d 337, 341 (Ind.2006) (declining to recognize a cause of action for third-party spoliation of evidence and noting that proving damages in such cases "becomes highly speculative and involves a lawsuit in which the issue is the outcome of another hypothetical lawsuit").

{38} The Peters Group argues that they were entitled to disgorgement even in spite of the foregoing. Essentially, the Peters Group claims they do not need to show that harm resulted from Bennett's breach in order to justify disgorgement. In support of this argument, the Peters Group rely on a 1966 opinion from this Court, *Iriart v. Johnson,* 75 N.M. 745, 749, 411 P.2d 226, 228 (1966), which held that sellers of real estate were entitled to relief based *solely* on the broker's failure as a fiduciary to disclose material facts about potential future increases in market value from which he then made a profit by secretly buying the land himself and then reselling it for a large profit. The Court imposed a constructive trust on the broker's profits, even though it was conceded that the seller received fair value for the land and might have approved the sale of the property in any event, even if he had known the undisclosed facts. *Id.*

{39} We are not persuaded that *Iriart* compels disgorgement in this case. In *Iriart,* the broker was forced to surrender his profit to the seller, putting the seller in the same position he might have been in had there been full disclosure. The Court took the profit away from the deceitful broker and transferred it to the wronged party, who at least was in a position to have made the same profit himself, whether or not he would actually have done so. By contrast, the Peters Group has lost nothing; they received fair value for their stock in NMBIC, and under no circumstances might they have obtained additional profit had Bennett notified them a few weeks earlier of BBV's intended sale. Thus, the Peters Group is *already* in the same position as it would have been had there been full disclosure. *Iriart* does not override the trial court's discretion to take into account the effect of the breach in determining whether additional remedies, such as disgorgement, should be allowed. *See, e.g., Int'l Telecharge, Inc. v. Bomarko, Inc.,* 766 A.2d 437, 442 (Del.2000) (holding the trial court was within its "broad discretion" in determining that its valuation of the corporation in the appraisal proceeding took into account the benefits that accrued to the corporation and deprived the controlling stockholder of the benefits of the merger transaction, and thus, "any order requiring disgorgement would constitute a double recovery for [the] plaintiffs" (quoted authority omitted)).

{40} The Peters Group also argues that Bennett's failure to disclose the stock re-

demption transaction left them with too little time to adequately evaluate the advantages and disadvantages of the transaction to determine whether they wanted to participate in it. However, the Peters Group did not put on any evidence demonstrating that the time they actually had was inadequate or what they would have done with more time. Further, the appraisal statute itself indicates what the Legislature believed to be a reasonable amount of time for a shareholder to evaluate a corporate transaction. Section 53–15–4(A) allows ten days after the vote approving a transaction is taken for a shareholder who has filed an objection to that transaction to decide whether to file a demand seeking payment for his shares. Absent an affirmative showing that the time between when the Peters Group was notified of the transaction and when they were required to file their written demand was an unreasonable amount of time in which to adequately evaluate the transaction, the claimed inability of the Peters Group to do so does not constitute the type of harm on which to base equitable or punitive damages.

{41} Moreover, had the Peters Group decided to remain shareholders in NMBIC, they too could have bought stock at the same price as Bennett and realized a similar gain. The disgorgement remedy is applicable only to those benefits secured by the breaching party that were not also available to the complaining party. *See, e.g., Koos v. Cent. Ohio Cellular, Inc.,* 94 Ohio App.3d 579, 641 N.E.2d 265, 272 (1994) (holding that controlling shareholders did not breach their fiduciary duty because "they afforded [the] plaintiffs the same opportunities of which the majority took advantage"); *Crosby v. Beam,* 47 Ohio St.3d 105, 548 N.E.2d 217, 218 (1989) ("Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, *without providing minority shareholders with an equal opportunity to benefit,* such breach, absent any legitimate business purpose, is actionable." (emphasis added)). Under these circumstances, the trial court did not abuse its discretion in refusing to order disgorgement.

## Punitive Damages

{42} In addition to deciding against disgorgement, the district court declined to award punitive damages, finding that Bennett's failure to disclose the stock redemption agreement was not motivated by a desire to "entrench" Bennett or harm the Peters Group, but rather to avoid litigation for NMBIC. *Peters Corp.,* 2007–NMCA–065, ¶ 10. Further, as discussed previously, the court determined that the Peters Group had not been able to demonstrate that Bennett's breach caused them any harm. On certiorari, as in the Court of Appeals, the Peters Group essentially argues that the district court was required to award punitive damages as a matter of law, regardless of whether the breach caused them any harm. We disagree.

{43} "Punitive damages ... are not awarded as a matter of right, but lie within the sound discretion of the [trial] court." *N.M. Hosp. Ass'n v. A.T. & S.F. Mem'l Hosps., Inc.,* 105 N.M. 508, 513, 734 P.2d 748, 753 (1987); *see also Jackson Nat'l Life Ins. Co. v. Receconi,* 113 N.M. 403, 419, 827 P.2d 118, 134 (1992) ("An award of punitive damages is discretionary...."). We review a trial court's decision not to award punitive damages for abuse of discretion, and we will only reverse that decision if it is "contrary to logic and reason." *N.M. Hosp. Ass'n,* 105 N.M. at 513, 734 P.2d at 753.

{44} To impose punitive damages in a breach of fiduciary duty action, a finding of an "evil motive" or "culpable mental state" beyond that necessary to establish the underlying cause of action is required. *Walta,* 2002–NMCA–015, ¶¶ 56–57 (quoted authority omitted). Thus, a breach of fiduciary duty without a culpable mental state may be sufficient to support compensatory but not punitive damages. *Id.* ¶ 57. The district court in this case rejected the Peters Group's proposed findings that Bennett's actions were "willful" or "malicious," arose from "personal animosity," or were designed to "entrench" Bennett or "squeeze out" the Peters Group. Though the withholding of information was intentional in the sense that Bennett knew

that he was withholding information, it was not malicious in the sense that it was calculated to harm the Peters Group, or done with the knowledge that it likely would cause harm. The district court did not find the type of malicious, willful, or otherwise culpable conduct that would support an award of punitive damages. Instead, substantial evidence supports the court's findings to the contrary.

{45} Ironically, even without disgorgement and punitive damages, the Peters Group has already obtained much of what the non-controlling shareholder in *McMinn II* was seeking: an award of the fair value of their stock, whether that award is characterized as an appraisal remedy or as damages for breach of fiduciary duty. In *McMinn II*, the controlling shareholders were attempting to prevent McMinn from recovering the fair value of his shares, as determined by either a court or a jury, because McMinn had elected not to seek an appraisal, and had instead filed an action for breach of fiduciary duty. In this case, the statutory appraisal procedures were followed to the letter by both the Peters Group and NMBIC. The Peters Group was awarded fair value for their stock, in an amount higher than the price they had originally sought, and which included interest at a rate of 10%, compounded annually. Further, the Peters Group had a fair opportunity to persuade the court that Bennett's breach warranted punitive damages or equitable relief. Their lack of success does not constitute legal error or entitle them to a new trial. *See, e.g., Walta*, 2002–NMCA–015, ¶ 57 (noting the court could "conceive of breaches of fiduciary duty sufficient to support compensatory, but not punitive, damages").

**Remaining Issues**

{46} We now address the three remaining issues on appeal: control premiums, the breach of contract claim, and compound interest. As we are generally in agreement with both the analysis and the result reached

by the Court of Appeals on these issues, our discussion is brief. We refer the reader to the Court of Appeals opinion below for a more comprehensive discussion of these three issues.

*Control Premiums*

{47} The Peters Group argues that the district court should have added a control premium of 40% to the total business value of NMBIC, which would have increased the fair value of their shares for purposes of appraisal and buy-out. The Court of Appeals aptly explained control premiums as follows:

> A control premium is [a] premium paid for shares carrying the power to control a corporation. A control premium typically refers to the additional amount a buyer would pay for a block of shares that would give the buyer control of a corporation. More broadly considered, the determination of an appropriate control premium adjustment entail[s] considering any number of factors including, whether the sale ends a long-standing controversy over control of the company, whether the sale involves a substantial percentage of the corporation's stock, whether the sale would give the buyers the certainty of ongoing control, and whether the buyers could afford to pay a substantial premium. Therefore, depending on the facts of a particular case . . . control premiums may or may not be a relevant factor in the fair value analysis.

*Peters Corp.*, 2007–NMCA–065, ¶ 16 (internal quotation marks and citations omitted) (first two alterations in original).

{48} The Peters Group reasons that, under one of the methods used by their expert to arrive at a valuation of their shares, the "guideline publicly traded company method," a minority discount was necessarily built into the valuation of their shares because the data on public trades are data on trades of minority shares.[2] Thus, they argue that the

---

2. Minority discounts are essentially the opposite of control premiums. Whereas control premiums reflect a premium paid for shares that carry the power to control a corporation, minority discounts reduce the fair value of minority shares "to reflect their owners' lack of power in the administration of the corporation." *Friedman v. Beway Realty Corp.*, 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972, 977 (1995); *see also* Richard A. Booth, *Minority Discounts and Control Premiums in Appraisal Proceedings*, 57 Bus. Law. 127, 131 (2001) (explaining that "the term mi-

court had to add a control premium to offset that built-in discount. The district court rejected expert testimony to that effect, awarding fair value without including either a minority discount or a control premium.

{49} The Court of Appeals observed that New Mexico law supports a case-by-case assessment of whether fair value should be adjusted for control premium, and that New Mexico courts have "deferred to the fact finder in upholding or denying adjustments to fair value for control premium." *Id.* ¶ 18. In this case, both the district court and the Court of Appeals recognized that "sale of control was not at stake." *Id.* ¶ 20. "Although the Peters Group were part of the control group as signatories to the Shareholder Agreement and the BBV Agreement, they were minority shareholders within that group and within NMBIC as a whole." *Id.* ¶ 21. Therefore, "the Peters Group had no real expectation or ability, on their own, to control the NMBIC Board of Directors or other shareholders." *Id.* The Court of Appeals also noted that the district court's decision not to include a minority or marketability discount in its valuation made the addition of a control premium "to offset any theoretically alleged built-in discount" unwarranted. *Id.* Thus, the Court of Appeals held that the evidence presented in this case supported the district court's decision not to include an adjustment for control premium in its determination of fair value of the Peters Group's shares. We agree. In addition, our cases have long held that it is the prerogative of the finder of fact to accept or reject expert testimony and to select which parts of the witnesses' testimony to believe or disbelieve. *See, e.g., Gutierrez v. Albertsons, Inc.,* 113 N.M. 256, 261–62, 824 P.2d 1058, 1063–64 (Ct.App.1991) (indicating that the fact finder may select which portions of the witnesses'

testimony to believe, provided that the fact finder may not fragment the testimony to the point of distortion); *Sanchez v. Molycorp, Inc.,* 103 N.M. 148, 153, 703 P.2d 925, 930 (Ct.App.1985) ("[T]he opinions of an expert even where uncontradicted, are not conclusive on facts in issue and the fact finder may reject such opinion in whole or in part.").

*Breach of Contract*

{50} As to their breach of contract claim under the BBV Agreement, the Peters Group contends that the BBV Agreement was ambiguous regarding whether one signatory, by deciding not to exercise a right of first refusal or assign that right, could effectively defeat the rights of first refusal of the other signatories. Thus, the Peters Group argues that summary judgment was inappropriate on their breach of contract claim. The Court of Appeals agreed with the district court that the language of the BBV Agreement unambiguously required the shareholders to act collectively to purchase all of the offered shares. *Id.* ¶ 36. Therefore,

> the effect of [the right of first refusal provision] reflects the parties' intent that any NMBIC shareholder, by declining to exercise their option to purchase their pro rata portion of the BBV shares and by declining to assign their option to purchase their pro rata portion to another shareholder, could prevent any other shareholder from purchasing any BBV shares and allow BBV to sell its shares to a third party.

*Id.* ¶ 39. We are not persuaded that the BBV Agreement is ambiguous in this respect or that the lower courts erred in their resolution of this issue.

---

nority discount ... refers to a discount from the price that would be set for non-control shares in an active market simply because they are minority shares and have no power to influence the governance of the corporation and may therefore be exposed to the possibility of looting"). In addition to rejecting the Peters Group's argument for the addition of a control premium to the appraised value of their shares, the district court also rejected NMBIC's argument for the subtraction of a minority discount from the value

of those shares. Because NMBIC did not appeal the district court's refusal to include a minority discount in calculating fair value, this case involves only control premiums, and we affirm the Court of Appeals' analysis as it relates to that issue only. We do not address whether minority discounts are disallowed as a matter of law when calculating fair value in an appraisal proceeding, or whether, like control premiums, the decision to include such discounts is made on a case-by-case basis.

*Compound Interest*

{51} Finally, with regard to its cross-appeal on the issue of compound interest, NMBIC argues that Section 53–15–4(F) only authorizes the district court to award simple interest, not interest compounded annually. The statute provides that an award of fair value "shall include an allowance for interest at such rate as the court may find ... fair and equitable." *Id.* The plain language of the statute "allows the district court broad discretion in fashioning an allowance for interest that is fair and equitable" and "neither authorizes nor prohibits the award of compound interest." *Peters Corp.,* 2007–NMCA–065, ¶¶ 43, 45. Thus, the Court of Appeals held that the statute allows a district court to award compound interest if the court determines that such would be "fair and equitable." The Court of Appeals determined that the district court was within its discretion in awarding interest at a rate of 10% compounded annually. *Id.* ¶ 46. We agree with the Court of Appeals' assessment of Section 53–15–4(F) and the district court's discretion to award compound interest in this case.

{52} We also add the following to the Court of Appeals' rationale. The language of Section 53–14–4(F) is significantly different from the language of our other interest statutes, NMSA 1978, §§ 56–8–3 (1983) and 56–8–4 (2004), in that neither of these two statutes contains the language "fair and equitable, in all the circumstances." Therefore, we disagree with NMBIC that the Legislature had prior case law construing those statutes in mind when enacting Section 53–15–4. We further disagree with NMBIC that "rate" of interest is limited to the percentage rate to the exclusion of how it is calculated. As determined in *Consolidated Oil & Gas, Inc. v. Southern Union Co.,* 106 N.M. 719, 725, 749 P.2d 1098, 1104 (1987), the method of compounding does have an effect on the rate of interest.

**CONCLUSION**

{53} We affirm the Court of Appeals and the judgment of the district court.

{54} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, PATRICIO M. SERNA, Justices, and LYNN PICKARD, CAMILLE MARTINEZ–OLGUIN, Judges (sitting by designation).